# IN THE SUPREME COURT OF IOWA

No. 19–0180

Submitted September 17, 2020—Filed June 18, 2021

**STATE OF IOWA,**

Appellee,

vs.

**NICHOLAS DEAN WRIGHT,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Cerro Gordo County, Adam D. Sauer, District Associate Judge.

A defendant appeals the denial of his motion to suppress evidence based on the warrantless seizure of his trash. **AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

McDonald, J., delivered the opinion of the court, in which Oxley and McDermott, JJ., joined, and in which Appel, J., joined as to divisions I, IV(B)–(E), and V. Appel, J., filed a special concurrence. Christensen, C.J., filed a dissenting opinion, in which Waterman and Mansfield, JJ., joined. Waterman, J., filed a dissenting opinion, in which Christensen, C.J., and Mansfield, J., joined. Mansfield, J., filed a dissenting opinion, in which Christensen, C.J., and Waterman, J., joined.

Colin C. Murphy (argued) of Gourley Rehkemper Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines (argued), Assistant Attorney General, Carlyle D. Dalen, County Attorney, and Steven D. Tynan, Assistant County Attorney, for appellee.

**McDONALD, Justice.**

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 575 (1928) (Brandeis, J., dissenting), *overruled in part by Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), *and Berger v. New York*, 388 U.S. 41, 87 S. Ct. 1873 (1967). We are tasked in this case of determining whether this bedrock constitutional principle prohibits a peace officer engaged in general criminal investigation without a warrant from taking a citizen's opaque trash bags left outside for collection, opening the trash bags, and rummaging through the papers and effects contained therein.

I.

Nicholas Wright lives in Clear Lake. Like most municipalities, Clear Lake regulates the "storage, collection and disposal of solid waste" to protect the "health, safety and welfare" of its residents. Clear Lake, Iowa, Code of Ordinances § 105.01 (2003). The city restricts the manner in which residents can dispose of waste. *See id.* at §§ 105.05 (restricting open burning), .06 (requiring separation of yard waste), .07 (prohibiting littering), .08 (prohibiting open dumping). The city requires "the owner or occupant of the premises served" to set out the solid waste containers for collection once per week "at the curb or alley line." *Id.* at §§ 105.10(3), 106.04. The city limits who may access and collect solid waste to licensed and contracted collectors. *See id.* § 105.02(1) (defining collector); *id.* §§ 106.01 (providing for collection service), .06 (granting collectors right of entry), .07 (prohibiting solid waste collection without a city contract), .11 (setting forth licensing requirements). The city makes it "unlawful for any person to . . . [t]ake or collect any solid waste which has been placed out

for collection on any premises, unless such person is an authorized solid waste collector." *Id.* § 105.11(4). Violation of this ordinance is punishable by a fine. *See id.* § 1.15.

Despite the ordinance making it unlawful for any person (other than an authorized collector) to take solid waste placed out for collection, Officer Brandon Heinz, on three occasions, during the dark of night, without probable cause or a warrant, went into the alley behind Wright's residence to take Wright's garbage bags and search through them to "obtain information about what Mr. Wright may have been doing inside [his] house." More specifically, Officer Heinz was "looking for anything related to drug activity." Heinz focused his criminal investigation on Wright based on information from Deputy Tami Cavett. She informed Heinz that a male nicknamed "Beef" was selling drugs and lived near a local bar. Through the course of his investigation, Heinz discovered Wright went by the nickname "Beef" and lived three blocks from the bar.

The first time Heinz went through Wright's papers and effects occurred on September 11, 2017. Around 11:30 p.m. that night, Heinz observed two garbage cans without lids at the edge of the alley behind Wright's residence. Heinz believed the garbage cans had been placed there for waste collection the next morning. He testified he was able to access the garbage bags without leaving the alley. The bags were opaque, and Heinz "couldn't see through them or anything." He was not "able to observe anything that led [him] to believe there was evidence of criminal activity in the bag until [he] opened the bag." Heinz "retrieved the garbage bags and brought them to the police department where [he] went through them."

Heinz testified he "[s]earched through the contents for narcotics related contraband." He found empty poppy seed packages and fabric

squares with circular brown stains around one inch in diameter and seeds stuck to the fabric. He submitted the seeds and fabric squares to the Division of Criminal Investigation (DCI) for testing. Heinz received the DCI lab report on November 2, which confirmed the seeds were poppy seeds. One fabric square tested positive for morphine. Two fabric squares tested positive for a combination of morphine and cocaine.

After receiving test results from DCI, Heinz again took garbage bags from the alley behind Wright's home on the nights of November 6 and November 20 and returned to the police station to search through the bags. On November 6, Heinz found two pieces of mail addressed to Wright, one from a bank and one from a telecommunications company. Heinz found more fabric squares with brown stains and poppy seeds stuck to them. On November 20, he found similar items as well as empty poppy seed packages and a 10-pound poppy seed package that had 9.75 pounds remaining in the package.

Heinz then applied for and was granted a search warrant. Probable cause for the search warrant was predicated on the evidence obtained from the warrantless seizure and search of Wright's trash bags. The police executed the warrant at Wright's residence on November 21. They discovered a baggie containing two grams of marijuana and several capsules of Vyvanse, a prescription drug for which Wright had no prescription.

The State charged Wright with three counts of unlawful possession of drugs: (1) possession of a prescription drug without a valid prescription, in violation of Iowa Code section 155A.21 (2017); (2) possession of marijuana, in violation of Iowa Code section 124.401(5); and (3) possession of Vyvanse, in violation of Iowa Code section 124.401(5).

Wright timely filed a motion to suppress evidence. Wright argued Heinz's warrantless removal of the trash bags from Wright's residence and search of the papers and effects contained therein violated Wright's federal and state constitutional rights to be free from unreasonable seizures and searches. Wright made two arguments in support of his motion. First, he argued Heinz physically trespassed on his property. Second, he argued he had a reasonable expectation of privacy in the contents contained in his trash bags. Wright argued the search warrant ultimately issued was without probable cause if the evidence obtained from the warrantless seizures and searches of his trash bags were suppressed. The district court denied the motion.

Pursuant to a plea agreement, the State subsequently dismissed count one of the trial information. Following a trial on the minutes of testimony, the district court found Wright guilty of counts two and three and sentenced Wright to serve two days in jail.

Wright appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the district court's denial of Wright's motion to suppress evidence. The court of appeals reasoned Heinz did not unlawfully trespass on Wright's property because there was no physical intrusion into a constitutionally protected area. The court of appeals reasoned Wright had no reasonable expectation of privacy in the contents of his garbage under federal or state law.

We granted Wright's application for further review. "On further review, we have the discretion to review any issue raised on appeal." *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 255 (Iowa 2012) (quoting *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016)). Where, "as here, a defendant raises both federal and state constitutional claims, the court

has discretion to consider either claim first or consider the claims simultaneously." *State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011). Because Wright's state constitutional claim is dispositive of the case, we exercise our discretion to address only that claim. The court of appeals decision is final as to Wright's federal claim.

II.

The Iowa Constitution provides, "This Constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void." Iowa Const. art. XII, § 1. The Iowa Constitution provides any law—without regard to its source—inconsistent therewith "shall be void." *Id.* None of the departments of our state government are authorized—by bill, order, rule, judicial decision, or otherwise—to make law or legalize conduct infringing upon the minimum rights guaranteed in the Iowa Constitution. We "must provide at a minimum the degree of protection [the constitution] afforded when it was adopted." *United States v. Jones*, 565 U.S. 400, 411, 132 S. Ct. 945, 953 (2012) (emphasis omitted).

In determining the minimum degree of protection the constitution afforded when adopted, we generally look to the text of the constitution as illuminated by the lamp of precedent, history, custom, and practice. *See Planned Parenthood of the Heartland v. Reynolds*, 915 N.W.2d 206, 247 (Iowa 2018) (Mansfield, J., dissenting) (beginning constitutional analysis with the text and original understanding); *State v. Crooks*, 911 N.W.2d 153, 167 (Iowa 2018) ("In exercising our independent judgment, we are 'guided by "the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the [Iowa Constitution's] text, history, meaning, and purpose." ' " (alterations in original) (quoting *State v. Lyle*, 854 N.W.2d 378, 386 (Iowa 2014))); *State v. Green*, 896 N.W.2d 770, 778 (Iowa 2017) ("[W]e interpret our constitution consistent

with the text given to us by our founders through the lens of the facts and circumstances of today."); *State v. Senn*, 882 N.W.2d 1, 8 (Iowa 2016) ("First and foremost, we give the words used by the framers their natural and commonly-understood meaning. However, we may also examine the constitutional history and consider the object to be attained or the evil to be remedied as disclosed by the circumstances at the time of adoption." (quoting *Star Equip., Ltd. v. State*, 843 N.W.2d 446, 457–58 (Iowa 2014))).

This court is the final arbiter of the meaning of the Iowa Constitution. While we give respectful consideration to the decisions of the United States Supreme Court in its interpretation of parallel provisions of the Federal Constitution, we have a duty to independently interpret the Iowa Constitution. *See State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019). Our duty to independently interpret the Iowa Constitution holds even "though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." *State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016) (quoting *State v. Jackson*, 878 N.W.2d 422, 442 (Iowa 2016)). On questions of state constitutional law, the Supreme Court "is, in law and in fact, inferior in authority to the courts of the States." *McClure v. Owen*, 26 Iowa 243, 249 (1868); *see also Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S. Ct. 676, 679 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").

Our duty of independent interpretation is truly independent. Federal constitutional law is not a framework or "floor" that dictates the required doctrine or minimum content of the state constitution. *See State v. Ingram*, 914 N.W.2d 794, 799 (Iowa 2018) ("Although the Iowa and United States Constitutions have similarly worded search and seizure provisions, that does not mean the two regimes and the cases under them

may be conflated.").[1]  "However useful that floor-ceiling metaphor may be, it obscures the larger truth that the level of protection of rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution."  *Malyon v. Pierce County*, 935 P.2d 1272, 1281 n.30 (Wash. 1997) (en banc) (quoting Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind*, 5 St. Thomas L. Rev. 49, 50 (1992)).[2]

In claims arising under the Iowa Constitution, the right question is thus not whether the Iowa Constitution should be interpreted more stringently or less stringently than its federal counterpart.  "This court is free to interpret our constitution to provide less or more protection than the Federal Constitution."  *Brown*, 930 N.W.2d at 857 (McDonald, J., concurring specially).  Instead,

> The right question is what the [Iowa Constitution] means and how it applies to the case at hand.  The answer may turn out

---

[1]Although the Federal Constitution does not set a legal floor in terms of dictating content of the Iowa Constitution, it does provide an effective floor in the practical sense that government officials are required to comply with the more stringent standard.

[2]*See also State v. Oliver*, 372 S.E.2d 256, 259 (Ga. Ct. App. 1988) ("If anything, the Georgia Constitution is less protective than the Fifth Amendment, for it recognizes an exception to the bar against double jeopardy when the first trial ends in mistrial."); *State v. Jackson*, 503 S.E.2d 101, 103 (N.C. 1998) ("Strictly speaking, however, a state may still construe a provision of its constitution as providing less rights than are guaranteed by a parallel federal provision."); *Alva State Bank & Tr. Co. v. Dayton*, 755 P.2d 635, 638 (Okla. 1988) (Kauger, J., specially concurring) (per curiam) (recognizing that if the state constitution provides less protection than federal law, then "the question must be determined by federal law"); *Ex parte Tucci*, 859 S.W.2d 1, 32 n.34 (Tex. 1993) (Phillips, C.J., concurring) ("Literally read, this position makes no logical sense.  If our text was written at a different time by different people with different concerns, then the protection it affords may be greater, lesser, or the same as that provided by a different provision in the United States Constitution."); *Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998) (en banc) ("The Supremacy Clause means that, in practical terms, persons will always be able to avail themselves of the greater right.  This is very important to litigants and their counsel, who are naturally and properly result-oriented.  But it does not mean that a court, faithfully interpreting state laws, can only find in them protections that equal or exceed federal laws."); *State v. Briggs*, 199 P.3d 935, 942 (Utah 2008) (recognizing state law may "provide a lesser level of protection," in which case the court addresses the federal claim).

the same as it would under federal law. The [Iowa Constitution] may prove to be more protective than federal law. The [Iowa Constitution] also may be less protective. In that case the court must go on to decide the claim under federal law, assuming it has been raised.

Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 179 (1984) [hereinafter Linde]; *see also Massachusetts v. Upton*, 466 U.S. 727, 738, 104 S. Ct. 2085, 2091 (1984) (Stevens, J., concurring in the judgment) (per curiam) (quoting Linde, 18 Ga. L. Rev. at 179).

### III.

Article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.[3]

### A.

At the time of America's founding, the prohibition against "unreasonable" seizures and searches had a particular meaning. John Adams first introduced the term "unreasonable" into search and seizure law in his draft of the 1780 Massachusetts Constitution. *See Commonwealth v. Haynes*, 116 A.3d 640, 650 (Pa. Super. Ct. 2015). "Adams's authorship reveals that 'unreasonable' was derived from Sir Edward Coke's earlier use of 'against reason' as a synonym for inherent illegality or unconstitutionality." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 554–55 (1999).

---

[3]The Fourth Amendment to the United States Constitution is materially indistinguishable from article I, section 8 of the Iowa Constitution. Because our search and seizure jurisprudence is intertwined with federal search and seizure jurisprudence, we will discuss federal cases as relevant.

The Fourth Amendment did not refer to reasonableness in a relativistic, balancing sense. "Originally, the word 'unreasonable' in the Fourth Amendment likely meant 'against reason'—as in 'against the reason of the common law.'" *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2243 (2018) (Thomas, J., dissenting) (quoting Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1270 (2016)); *see also Torres v. Madrid*, 592 U.S. ___, ___, 141 S. Ct. 989, 996 (2021) ("Early American courts . . . embraced other common law principles of search and seizure."); *United States v. Carloss*, 818 F.3d 988, 1006 (10th Cir. 2016) (Gorsuch, J., dissenting) ("[T]he Fourth Amendment, at a minimum, protects the people against searches of their persons, houses, papers, and effects to the same degree the common law protected the people against such things at the time of the founding, for in prohibiting 'unreasonable' searches the Amendment incorporated existing common law restrictions on the state's investigative authority."). Justice Story, in his leading treatise on the Federal Constitution, stated the prohibition against unreasonable seizures and searches "is little more than the affirmance of a great constitutional doctrine of the common law." 3 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1894–1895, at 748 (1833). "[B]y prohibiting 'unreasonable' searches and seizures in the Fourth Amendment, the Founders ensured that the newly created Congress could not use legislation to abolish the established common-law rules of search and seizure." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2243.

## B.

The original understanding of article I, section 8 is in accord with the original understanding of the Fourth Amendment. *See Pals*, 805 N.W.2d at 786 (Waterman, J., dissenting). As we long ago explained, "The

term 'unreasonable' in the constitutions of the States, has allusion to what had been practiced before our revolution, and especially to general search warrants, in which the person, place or thing was not described." *Santo v. State*, 2 Iowa (2 Clarke) 165, 215 (1855).

Consistent with this understanding, we have long held that a peace officer engaged in general criminal investigation acted unreasonably and unlawfully when he trespassed against a citizen without first obtaining a warrant based on probable cause. *See Godfrey v. State*, 898 N.W.2d 844, 887–88 (Iowa 2017) (Mansfield, J., dissenting) (recognizing officer conduct was governed by common law trespass actions). In the colorful case of *McClurg v. Brenton*, the mayor, "the chief of police, the captain of the night force, a city alderman, the city physician, the 'man with the hounds,' and various other gentlemen, presumably volunteers in the cause of retributive justice," showed up at the plaintiff's home at night without a warrant to search for allegedly stolen chickens. 123 Iowa 368, 369–70, 98 N.W. 881, 881–82 (1904). They gained entry into the home and the chicken house and conducted what was described as a "boisterous" search. *Id.* at 371, 98 N.W. at 882 (noting a "member of the party became somewhat confused as to the real object of the search, and demanded to know whether there was 'any beer in the cellar' "). The plaintiff sued for trespass. *See id.* at 372, 98 N.W. at 882. In that case, we stated the great principle underlying the prohibition against unreasonable search and seizure:

> The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna Charta down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic.
>
> The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of a

home and subject its occupants to the indignity of a search for the evidences of crime, without a legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open.

*Id.* at 371–72, 98 N.W. at 882.

*McClurg* involved the search of a home and outbuildings, but the same prohibition against unlawful seizures and searches extended outside the home to seizures of and interferences with personal property. *See Ingram*, 914 N.W.2d at 817 (stating citizens have a protected interest in papers and effects outside the home).

[T]here is no evidence at all that [the Framers] intended to exclude from protection of the Clause all searches occurring outside the home. The absence of a contemporary outcry against warrantless searches in public places was because, aside from searches incident to arrest, such warrantless searches were not a large issue in colonial America.

*United States v. Chadwick*, 433 U.S. 1, 8, 97 S. Ct. 2476, 2482 (1977), *abrogated by California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982 (1991).

In *Pomroy & Co. v. Parmlee*, the plaintiffs sued out a criminal warrant and civil writ of attachment in Scott County against the defendant for the purpose of attaching and levying on the defendant's property. 9 Iowa 140, 143–44 (1859). The sheriff of Scott County seized the defendant's property, a trunk, in Poweshiek County and returned it to Scott County whereupon it was opened and searched and a bag of gold coin was found in it. *See id.* at 144–45. The plaintiffs sought to levy on the gold. *See id.* at 145. The defendant objected on the ground the sheriff had no authority under the writ of attachment to seize property outside Scott County. *See id.* at 144. We agreed: "The authority (of the sheriff) is given upon this restriction and condition, that it shall not be abused or exceeded, or colorably used to effect an unlawful purpose." *Id.* at 146

(alteration in original) (quoting *Ilsley v. Nichols*, 29 Mass. (12 Pick.) 270, 281 (1831)). We concluded the sheriff's seizure of the defendant's trunk outside his county was "a great abuse of the law . . . and of the authority of its officer." *Id.* at 147. We explained, "The law will operate retrospectively to defeat all acts thus done under color of lawful authority, when exceeded; and *a fortiori*, will it operate prospectively, to prevent the acquisition of any lawful rights, by the excess and abuse of an authority given for useful and beneficial purposes." *Id.* at 146–47 (quoting *Ilsley*, 29 Mass. (12 Pick.) at 281).

Similarly, in *State v. Ward*, a pharmacist was prosecuted for illegal liquor sales. 75 Iowa 637, 36 N.W. 765 (1888). A constable entered the defendant's car with "no warrant, and he seized the liquor therein, and removed a portion of it on a dray near the car before the warrant was placed in his hands." *Id.* The court explained the officer "may have been guilty of a trespass." *Id.* at 639, 36 N.W. at 767. The court further explained that although the "search and seizure may have been illegally made in the first instance," that was not a defense to the charge. *Id.* at 640, 36 N.W. at 767.[4]

---

[4]The disposition of the case made sense at the time because Iowa had not yet adopted an exclusionary rule. At that time, those subject to unlawful seizures and searches could pursue civil actions for nominal, actual, and punitive damages against the offending officer and his sureties. *See McClurg*, 123 Iowa at 373, 98 N.W. at 883 ("If the jury should find for plaintiff—that the wrongful search was made . . . —they could, in addition to actual damages, assess a greater or less sum against the defendants by way of punishment or as exemplary damages."); *Strunk v. Ocheltree*, 11 Iowa 158, 159–60 (1860) ("The defendant levied upon the property and took possession of it by virtue of his office, and sold the same when he had no right to do so. . . . The wrong was committed by color of his office, a wrong which his sureties obligated themselves he would not do, and for which they should be held responsible."); *Plummer v. Harbut*, 5 Iowa (5 Clarke) 308, 314 (1857) ("If defendants, in executing the process, acted in good faith, and in their entry upon plaintiff's premises, were guilty of no oppression, and made no disturbance, further than was necessary in making the seizure, the trespass, even if without authority, was nominal only, and nominal damages must limit the extent of his recovery.").

As our precedents demonstrate, under Iowa law "[a] trespassing officer is liable for all wrong done in an illegal search or seizure. The constitutional provision is a sacred right, and one which the courts will rigidly enforce." *State v. Tonn*, 195 Iowa 94, 106, 191 N.W. 530, 535 (1923), *abrogated by State v. Hagen*, 258 Iowa 196, 137 N.W.2d 895 (1965); *see also Godfrey*, 898 N.W.2d at 887 (explaining police conduct was regulated by common law trespass actions).

C.

Iowa adhered to this original understanding of article I, section 8 until the era of incorporation of the Bill of Rights into the Fourteenth Amendment. Although not compelled to construe article I, section 8 to follow the Supreme Court's construction of the Fourth and Fourteenth Amendments, *see Brown*, 930 N.W.2d at 857–58 (discussing incorporation doctrine and state constitutional interpretation), this court nonetheless began to do so. *See Kain v. State*, 378 N.W.2d 900, 902 (Iowa 1985) ("[O]ur interpretation of article I, section 8 has quite consistently tracked with prevailing federal interpretations . . . ."). As a consequence, this court's jurisprudence changed rather dramatically in conjunction with changes in the Supreme Court's jurisprudence. The Supreme Court moved away from the original understanding of the Fourth Amendment right in two significant respects. First, the Court imposed a modern, relativistic meaning on the word "unreasonable." *See Ingram*, 914 N.W.2d at 804 ("[T]he new innovative touchstone under the more recent Supreme Court cases is a free-floating and open-ended concept of 'reasonableness' . . . ."). Second, in *Katz v. United States*, the Court refocused the inquiry from common law trespass to the aggrieved party's reasonable expectation of privacy. *See* 389 U.S. at 353, 88 S. Ct. at 512.

The Supreme Court's first doctrinal change involved a change in the interpretation of "unreasonable." The Supreme Court adopted a relativistic sense of reasonableness in *Carroll v. United States*, 267 U.S. 132, 147, 45 S. Ct. 280, 283 (1925). Dealing with practical problems related to the enforcement of prohibition, Chief Justice Taft loosened restrictions on the exercise of official authority and explained the "Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable." *Id.* However, he did not mean unreasonable as against the common law. Instead, he meant unreasonable in a relativistic sense— as in determining whether the action was reasonable under the circumstances. *See id.* at 149, 45 S. Ct. at 283–84 (describing valid searches and seizures as "reasonably arising out of circumstances known to the seizing officer").

The *Carroll* Court's reinterpretation of the Fourth Amendment gained traction. In *United States v. Rabinowitz*, the Court stated the legality of "searches turn[s] upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant." 339 U.S. 56, 65–66, 70 S. Ct. 430, 435 (1950), *overruled in part by Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034 (1969), *abrogation recognized by Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419 (2011). By the 1970s, the Court concluded the "touchstone" of the Fourth Amendment was "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S. Ct. 330, 332 (1977) (per curiam) (second quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878–79 (1968)). The Court continues to hold "the ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Riley v. California*, 573 U.S. 373, 381–82, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*,

547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006)). Under modern doctrine, reasonableness means determining the constitutionality of police conduct "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 385, 134 S. Ct. at 2484 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S. Ct. 1297, 1300 (1999)).

The second significant doctrinal change irrupted from the pen of Justice Harlan in his concurrence in *Katz*. *See Carpenter*, 585 U.S. at \_\_\_, 138 S. Ct. at 2237–38 (discussing history of *Katz*). In *Katz*, the Court asserted "the Fourth Amendment protects people, not places" and "what [a person] seeks to preserve as private . . . may be constitutionally protected." 389 U.S. at 351, 88 S. Ct. at 511. Justice Harlan, in a concurring opinion, articulated an expectation-of-privacy test. *See id.* at 361, 88 S. Ct. at 516 (Harlan, J., concurring). He "identified a 'twofold requirement' to determine when the protections of the Fourth Amendment apply: 'first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." ' " *Carpenter*, 585 U.S. at \_\_\_, 138 S. Ct. at 2237 (quoting *Katz*, 389 U.S. at 361, 88 S. Ct. at 516).

Justice Harlan's expectation-of-privacy standard quickly became the primary standard for determining the constitutionality of searches under the Fourth Amendment. The following year, in *Terry v. Ohio*, the Court explained that "wherever an individual may harbor a reasonable 'expectation of privacy,' he is entitled to be free from unreasonable governmental intrusion." 392 U.S. at 9, 88 S. Ct. at 1873 (citation omitted) (quoting *Katz*, 389 U.S. at 361, 88 S. Ct. at 516). By 1979, the Court stated *Katz* was the "lodestar" for evaluating claims arising under the

Fourth Amendment. *Smith v. Maryland*, 442 U.S. 735, 739, 99 S. Ct. 2577, 2579–80 (1979). Of note, the Supreme Court's expectation-of-privacy standard is not a standard to determine whether a search is "unreasonable" within the meaning of the Fourth Amendment. Instead, it is a threshold standard to determine whether a "search" occurred within the meaning of the Fourth Amendment. *See Jones*, 565 U.S. at 404–06, 132 S. Ct. 949–50.

This court generally followed these doctrinal developments to adjudicate claims arising under article I, section 8. In doing so, we acknowledged the shift from the historic approach. *See State v. Davis*, 228 N.W.2d 67, 71–72 (Iowa 1975) ("The issue where to draw the line has spawned a vast body of litigation. The rationale of modern decisions ordinarily posits the determination not so much on the character of the property on which the evidence is observed (i.e., public vis-a-vis private, curtilage vis-a-vis open area) but rather on existence of a reasonable expectation of privacy."), *overruled by State v. Hanes*, 790 N.W.2d 545 (Iowa 2010). Despite the incongruence with our own precedents, we concluded we had "an interest in harmonizing our constitutional decisions . . . when reasonably possible." *State v. Ochoa*, 792 N.W.2d 260, 265 (Iowa 2010) (omission in original) (quoting *State v. Groff*, 323 N.W.2d 204, 207–08 (Iowa 1982)). By 1985, we declared that " 'our interpretation of article I, section 8 has quite consistently tracked with prevailing federal interpretations' in deciding search and seizure issues." *Id.* at 266 (quoting *Kain*, 378 N.W.2d at 902). We did so in "a 'lockstep' approach to interpretation of state constitutional provisions." *Id.*

### D.

In recent years, this court has moved away from the lockstep approach and taken a more historical approach in interpreting article I,

section 8. *See State v. Coleman*, 890 N.W.2d 284, 296 (Iowa 2017) ("As has been thoroughly canvassed in some of our other opinions, the Iowa Supreme Court has a long history of independent adjudication of state constitutional issues. In recent decades, we have reemphasized that independent constitutional tradition.").

In *State v. Ochoa*, we canvassed the relevant historical materials and concluded our constitution was "intended to provide a limit on arbitrary searches and seizures, particularly those involving the home." 792 N.W.2d at 272. We explained the clause was intended to reject the issuance of "general warrants without probable cause and without particularity as reflected in pre-Revolutionary practice." *Id.* We also explained this prohibition necessarily disallowed warrantless searches circumventing the prohibition against general warrants. *See id.* at 273 ("It would make no sense to restrict general warrants and yet allow the same type of broad, unlimited search without a warrant"). We further noted the constitutional limitation on the exercise of warrantless authority was not limited to contexts involving infringements on privacy. *See id.* at 289 ("Indeed, to some extent, search and seizure protections must protect more than mere expectations of privacy if they are to have any bite at all.").

Two years later, in *State v. Short*, we noted the deficiencies inherent in the modern general reasonableness standard:

> [A]n interpretation that focuses on the reasonableness clause as the touchstone of search and seizure law sets up the intellectual machinery to engulf the warrant clause and make its mandatory provision ephemeral. The search and seizure protections of article I, section 8 would be subject to reasonability determinations by shifting four-member majorities of this court, based upon pragmatic considerations. Members of this court—indeed any court—can come up with ingenious explanations of how just about any search is reasonable. The cautionary words of Anthony Amsterdam in his classic study on the Fourth Amendment that reliance on reasonability threatens to convert "the [F]ourth [A]mendment

into one immense Rorschach blot" has even greater urgency today than it did forty years ago.

851 N.W.2d 474, 501–02 (Iowa 2014) (alterations in original) (citations omitted) (quoting Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 393 (1974)).

Like our court with respect to article I, section 8, the Supreme Court recently has moved toward a more historical approach to the Fourth Amendment. *See Torres*, 592 U.S. at ___, 141 S. Ct. at 995–98, 1000–02 (discussing common law understanding of the Fourth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168, 128 S. Ct. 1598, 1602 (2008) ("In determining whether a search or seizure is unreasonable, we begin with history. We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 326, 121 S. Ct. 1536, 1543 (2001) (stating the Court is guided by the common law at the time of the framing); *Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S. Ct. 1914, 1916 (1995) ("In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing.").

In *United States v. Jones*, the Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search' " within the meaning of the Fourth Amendment and was thus unlawful when done without a warrant. 565 U.S. at 404, 132 S. Ct. at 949 (footnote omitted). The Court explained *Katz* deviated from the Court's traditional and historical "property-based approach" to the Fourth Amendment. *Id.* at 405–06, 132 S. Ct. at 950. While the Court did not repudiate *Katz*, it explained *Katz* was accretive to and not a substitute for the old doctrine.

*See id.* at 407, 132 S. Ct. at 951 ("*Katz . . .* established that 'property rights are not the sole measure of Fourth Amendment violations,' [and] did not 'snuf[f] out the previously recognized protection for property.'" (second alteration in original) (quoting *Soldal v. Cook County*, 506 U.S. 56, 64, 113 S. Ct. 538, 545 (1992))).

The following year, in *Florida v. Jardines*, the Court held a peace officer conducted an unconstitutional search when the officer walked onto a homeowner's porch with a drug-sniffing dog to investigate the contents of the home. 569 U.S. 1, 9–10, 133 S. Ct. 1409, 1416–17 (2013). The Court explained the peace officer acting without a warrant had the right to do what "any private citizen might do." *Id.* at 8, 133 S. Ct. at 1416 (quoting *Kentucky v. King,* 563 U.S. 452, 469, 131 S. Ct. 1849, 1862 (2011)). However, the officer exceeded the license afforded to private citizens: "[S]ocial norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 9, 133 S. Ct. at 1416. The Court concluded law enforcement's use of the drug-sniffing dog to explore the area around the home was a search under the Fourth Amendment because the conduct was an unlicensed physical intrusion. *See id.* Justice Kagan, joined by Justices Ginsburg and Sotomayor, concurred in the opinion. *See id.* at 12, 133 S. Ct. at 1418 (Kagan, J., concurring). In their view, the peace officer, in exceeding the scope of the license afforded a private citizen by using a drug dog, committed a trespass at common law and invaded the defendant's privacy. *See id.* at 13, 133 S. Ct. at 1418 ("Was this activity a trespass? Yes, as the Court holds today. Was it also an invasion of privacy? Yes, that as well.").

This court and the Supreme Court's return to the historical understandings of seizure and search jurisprudence, to some degree, was born of necessity. Current Fourth Amendment jurisprudence is a mess.

*See Short*, 851 N.W.2d at 488 (noting scholars characterize the jurisprudence as "complex and contradictory" (quoting Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 758 (1994))). While *Katz* became " 'the basis of a new formula of fourth amendment coverage,' it can hardly be said that the Court produced clarity where theretofore there had been uncertainty. If anything, the exact opposite has occurred." 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(b), at 597 (6th ed. 2020) [hereinafter LaFave] (footnote omitted). "The pre-*Katz* rule . . . was 'a workable tool for the reasoning of the courts.' But the *Katz* rule . . . is, by comparison 'difficult to apply.' " *Id.* (footnotes omitted); *see also* Morgan Cloud, *Pragmatism, Positivism, and Principles in Fourth Amendment Theory*, 41 UCLA L. Rev. 199, 253 (1993) ("Over time expectations analysis has produced only an amorphous formula that allows the Justices to treat the fourth amendment as an instrument for achieving social goals approved by shifting majorities on the Court."); David Gray, *The Fourth Amendment Categorical Imperative*, 116 Mich. L. Rev. Online 14, 14–18 (2017) (explaining how the *Katz* decision made "current Fourth Amendment doctrine . . . unfounded, incoherent, and dangerous"). This criticism of the Supreme Court's doctrine is widely shared. *See Short*, 851 N.W.2d at 488 (collecting commentators' criticisms); William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1825 (2016) [hereinafter Baude & Stern] ("The reasonable expectation of privacy concept has other serious defects, including its ambiguous meaning, its subjective analysis, its unpredictable application, its unsuitability for judicial administration, and its potential circularity. We are happy to repeat these criticisms but we are hardly the first to raise

them. They have been exhaustively developed in Fourth Amendment scholarship over the last half-century.").

We would normally be reluctant to voice any such criticism of the Supreme Court's jurisprudence, but members of the Court also are critical of its jurisprudence. In a dissent highly critical of the modern regime, Justice Thomas recently noted:

> Jurists and commentators tasked with deciphering our jurisprudence have described the *Katz* regime as "an unpredictable jumble," "a mass of contradictions and obscurities," "all over the map," "riddled with inconsistency and incoherence," "a series of inconsistent and bizarre results that [the Court] has left entirely undefended," "unstable," "chameleon-like," " 'notoriously unhelpful,' " "a conclusion rather than a starting point for analysis," "distressingly unmanageable," "a dismal failure," "flawed to the core," "unadorned fiat," and "inspired by the kind of logic that produced Rube Goldberg's bizarre contraptions." Even Justice Harlan, four years after penning his concurrence in *Katz*, confessed that the test encouraged "the substitution of words for analysis." *United States v. White*, 401 U.S. 745, 786, 91 S. Ct. 1122, 28 L.Ed.2d 453 (1971) (dissenting opinion).

*Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2244 (alterations in original) (footnote omitted).

Other Justices share Justice Thomas's criticism of the *Katz* regime. Justice Gorsuch explained *Katz* was contrary to the text and original understanding of the Fourth Amendment:

> *Katz*'s problems start with the text and original understanding of the Fourth Amendment . . . . The Amendment's protections do not depend on the breach of some abstract "expectation of privacy" whose contours are left to the judicial imagination. Much more concretely, it protects your "person," and your "houses, papers, and effects." Nor does your right to bring a Fourth Amendment claim depend on whether a judge happens to agree that your subjective expectation to privacy is a "reasonable" one. Under its plain terms, the Amendment grants you the right to invoke its guarantees whenever one of your protected things (your person, your house, your papers, or your effects) is unreasonably searched or seized. Period.

*Carpenter*, 585 U.S. at \_\_\_, 138 S. Ct. at 2264 (Gorsuch, J., dissenting). In fact, "each of the Justices on the *Carpenter* Court, including those in the majority and all of the dissenters, has, at some point, either authored or joined an opinion critical of *Katz*, or at least *conceding the difficulty of applying it*[]."  Nicholas A. Kahn-Fogel, Katz*,* Carpenter*, and Classical Conservatism*, 29 Cornell J.L. & Pub. Pol'y 95, 106 (2019).

E.

"Fourth Amendment jurisprudence is in flux . . . ."  *Everett v. State*, 186 A.3d 1224, 1235 (Del. 2018).  There are competing, inconsistent doctrines governing seizure and search law—the original meaning, the "touchstone" of reasonableness, and the "lodestar" of *Katz*.  Given the uncertainty and lack of clarity in federal search and seizure jurisprudence, we conclude it is no longer tenable to follow federal precedents in lockstep. Article I, section 8, as originally understood, was meant to provide the same protections as the Fourth Amendment, as originally understood, but the Supreme Court's interpretation and construction of the Fourth Amendment has deviated from the text and original meaning.  Respectful consideration of the Supreme Court's precedents does not require adherence to federal doctrine that members of that great Court, other jurists, and commentators all acknowledge departs from the text and original meaning of the constitutional prohibition against unreasonable seizures and searches.

As discussed above, a survey of the relevant text, history, and precedents shows article I, section 8's prohibition against unreasonable searches and seizures was tied to common law trespass.  In light of that understanding, we hold a peace officer engaged in general criminal investigation acts unreasonably under article I, section 8 when the peace officer commits a trespass against a citizen's house, papers, or effects

without first obtaining a warrant based "on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized." Iowa Const. art. I, § 8.[5]

## IV.

We now directly address Wright's claim that Officer Heinz violated his state constitutional right under article I, section 8. Wright has two separate and distinct bases for challenging the warrantless seizures and searches. First, relying on the common law understanding of seizure and search law, Wright argues Heinz physically trespassed on Wright's property and thus the warrantless search violated article I, section 8. Second, relying on the expectation-of-privacy approach to seizure and search law, Wright argues Heinz violated article I, section 8 by invading Wright's expectation of privacy in his garbage bags. It is the State's burden

---

[5]The dissents are directed at monsters of their own making. The dissenters argue that the court's holding—that "if a private citizen can't do it, the police can't do it either"— is not supported by text or history. Except that is not what we hold. We hold that article I, section 8 prohibits an officer engaged in general criminal investigation from conducting a search or seizure that constitutes a trespass on a person's house, papers, or effects without first obtaining a warrant.

None of the dissenters disagree that article I, section 8, as originally understood, prohibited warrantless trespassory searches and seizures. The dissenters fail to recognize that what constitutes a trespass can change over time without changing the original meaning of article I, section 8. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164, 118 S. Ct. 1925, 1930 (1998) ("[T]he existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972))); Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 93 (2012) [hereinafter Kerr] ("Changes in trespass law could be recognized as changing the scope of protections without truly changing the Fourth Amendment . . . ."). Thus, one of the dissenting justices errs in arguing that scavenging through a citizen's trash cannot constitute a trespass because scavenging was common at the time of the founding. The dissenter confuses original meaning with original expected application. The original meaning of article I, section 8 was to prohibit an officer engaged in general criminal investigation from committing a trespass against a citizen's person, house, papers, and effects without first obtaining a warrant. While scavenging may have been allowed then, Iowa law disallows it now. The scope of what constitutes a trespass has changed, not the meaning of article I, section 8. *See Phillips*, 524 U.S. at 164, 118 S. Ct. at 1930; Kerr, 2012 Sup. Ct. Rev. at 93.

to prove that a warrantless search or seizure is constitutional. *See Ingram*, 914 N.W.2d at 824 (Mansfield, J., concurring specially).

### A.

We first consider whether Heinz's conduct amounted to a seizure or search within the meaning of article I, section 8. There is no evidence these terms were terms of art at the time of the founding. *See Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2238 (Thomas, J., dissenting) (stating the word "search" "was probably not a term of art, as it does not appear in legal dictionaries from the era"). "No literal or mechanical approach should be adopted in determining what may constitute a search and seizure." *State v. Raymond*, 258 Iowa 1339, 1347, 142 N.W.2d 444, 449 (1966). We thus give the words their fair and ordinary meaning.

It is apparent Heinz seized the garbage bags and papers and effects contained therein under any fair and ordinary definition of the term seizure. "A 'seizure' of property occurs when there is some meaningful interference" with the property. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984). In *Pomroy & Co.*, we concluded a sheriff unlawfully seized a trunk and the contents contained therein when the sheriff took possession of the items and transported them from one county to another. *See* 9 Iowa at 144–47. In *Ward*, we concluded a constable unlawfully seized a pharmacist's liquor when the constable took possession of the liquor. *See* 75 Iowa at 639–40, 36 N.W. at 766–67. As in those cases, Heinz meaningfully interfered with and "seized" the garbage bags and papers and effects contained therein when he removed the garbage bags from Wright's trash bins, took possession of them, and transported them to the police station for further inspection. *See Torres*, 592 U.S. at ___, 141 S. Ct. at 995 ("It is true that, when speaking of property, '[f]rom the time of the founding to the present, the word "seizure"

has meant a "taking possession." ' " (alteration in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 624, 111 S. Ct. 1547, 1549 (1991))).

It is equally apparent Heinz engaged in a search when he opened the garbage bags and rummaged through them. "When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.' " *Kyllo v. United States*, 533 U.S. 27, 32 n.1, 121 S. Ct. 2038, 2042 n.1 (2001) (alteration in original) (emphases omitted) (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)); *see also Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2238 (summarizing founding era definitions). Historical legal dictionaries defined a search as an examination "with a view to the discovery of contraband or illicit or stolen property, or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense with which he is charged," Henry Campbell Black, *A Dictionary of Law* 1069 (1st ed. 1891), or an examination conducted for the "purpose of discovering proof of his guilt in relation to some crime or misdemeanor of which he is accused." 2 John Bouvier, *A Law Dictionary* 498 (3d ed. 1848). Here, Heinz testified he opened the garbage to "obtain information about what Mr. Wright may have been doing inside [his] house" and obtain evidence "related to drug activity." A constitutional search occurs whenever the government commits a physical trespass against property, even where de minimis, conjoined with "an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408 n.5, 132 S. Ct. at 951 n.5; *see also Jardines*, 569 U.S. at 5, 133 S. Ct. at 1414 ("When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth

Amendment' has 'undoubtedly occurred.' " (quoting *Jones*, 565 U.S. at 406 n.3, 132 S. Ct. at 950 n.3)).

For the purposes of determining whether a seizure or search occurred, it is not relevant whether Wright had an expectation of privacy in the garbage bags or the contents.

> The *Katz* test distorts the original meaning of "searc[h]"—the word in the Fourth Amendment that it purports to define. Under the *Katz* test, the government conducts a search anytime it violates someone's "reasonable expectation of privacy." That is not a normal definition of the word "search."

*Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2238 (alteration in original) (citations omitted). To bring greater coherence to our seizure and search jurisprudence, we hold the expectation-of-privacy test is relevant only to the question of whether a seizure or search was unreasonable within the meaning of article I, section 8 and not whether a seizure or search has occurred. *See Minnesota v. Carter*, 525 U.S. 83, 97, 119 S. Ct. 469, 477 (1998) (Scalia, J., concurring) (explaining that when *Katz* is applied "to determine whether a 'search or seizure' within the meaning of the Constitution has occurred (as opposed to whether that 'search or seizure' is an 'unreasonable' one), it has no plausible foundation in the text of the Fourth Amendment" (emphasis omitted)).

### B.

We next address whether the items Heinz seized and searched were protected papers and effects within the meaning of article I, section 8.

The word papers is self-explanatory, but the word effects requires some explanation. The modern understanding of the term effects is "[m]ovable property; goods." *Effects, Black's Law Dictionary* (11th ed. 2019). This is consistent with the original understanding. "The Framers would have understood the term 'effects' to be limited to personal, rather

than real, property." *Oliver v. United States*, 466 U.S. 170, 177 n.7, 104 S. Ct. 1735, 1740 n.7 (1984).

We have little trouble concluding the property at issue is protected within the meaning of article I, section 8. Opaque garbage bags are containers, and containers are an "effect" as originally understood. *See United States v. Ross*, 456 U.S. 798, 822, 102 S. Ct. 2157, 2171 (1982). The fact that the containers happen to be garbage bags rather than, say, expensive luggage, is not of constitutional consequence. *See id.* There is no "constitutional distinction between 'worthy' and 'unworthy' containers." *Id.* "Even though such a distinction perhaps could evolve in a series of cases in which paper bags, locked trunks, lunch buckets, and orange crates were placed on one side of the line or the other, the central purpose of the Fourth Amendment forecloses such a distinction." *Id.* (footnote omitted). In addition, Heinz opened the garbage bags and searched through the contents. The contents included other personal property, including two pieces of mail addressed to Wright. Letters are certainly papers. Further, "[l]etters . . . are in the general class of effects," and "warrantless searches of such effects are presumptively unreasonable." *Jacobsen*, 466 U.S. at 114, 104 S. Ct. at 1657.

## C.

Heinz's seizure and search of the papers and effects would be inconsequential if the papers and effects did not belong to Wright. Article I, section 8 provides that people have the right to be secure in "their" persons, houses, papers, and effects. "Although phrased in the plural, '[t]he obvious meaning of ["their"] is that *each* person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects.'" *Carpenter*, 585 U.S. at ___, 138 S. Ct. at

2241–42 (alterations in original) (quoting *Carter*, 525 U.S. at 92, 119 S. Ct. at 475).

The State contends the papers and effects Heinz seized were not Wright's papers and effects because Wright abandoned them. Under Iowa law, "[a]bandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished *all* right, title and interest in the property." *Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc) (emphasis added). "Abandonment, however, entails a relinquishment of ownership interests without regard for who becomes the next owner, such that the items in question can be considered '*bona vacantia*'—a property law term meaning 'unowned'—and available for the taking by any finder." Tanner M. Russo, Note, *Garbage Pulls Under the Physical Trespass Test*, 105 Va. L. Rev. 1217, 1246–47 (2019) [hereinafter Russo] (footnote omitted).

Here, Wright did not abandon all right, title, and interest in the property. Local ordinances provide only a licensed collector under contract with the city may collect garbage. *See* Clear Lake, Iowa, Code of Ordinances § 106.11. The ordinances make it "unlawful for any person to . . . [t]ake or collect any solid waste which has been placed out for collection on any premises, unless such person is an authorized solid waste collector." *Id.* § 105.11(4). In moving his trash to the alley for collection, Wright agreed only to convey his property to a licensed collector. *See People v. Edwards*, 458 P.2d 713, 718 (Cal. 1969) (en banc) (stating trash was not abandoned except "as to persons authorized to remove the receptacle's contents, such as trashmen"). Wright would have the right to retrieve the property prior to collection and the right to exclude all others from rummaging through his garbage bins prior to collection. *See Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2266 (Gorsuch, J., dissenting) ("I

doubt, too, that most people spotting a neighbor rummaging through their garbage would think they lacked reasonable grounds to confront the rummager."). As one commentator explained:

> [I]ndividuals who leave garbage on the curb generally do not expect that *anyone* will be able to take the discarded items but rather, per *Greenwood*, understand themselves as conveying refuse to a specific party who will function as the next true owner: the trash collector. This understanding seems especially clear in localities with anti-rummaging ordinances, under which all but designated trash collectors are prohibited from tampering with curbside garbage, such that unauthorized "finders" would presumably violate the ordinance by taking possession of garbage. If individuals placing garbage out for collection do not intend to leave the items for random "finders," placing garbage curbside arguably lacks the requisite "intent to abandon" necessary to qualify as property abandonment.

Russo, 105 Va. L. Rev. at 1247 (footnotes omitted). Until such time as the garbage bags were collected by a licensed collector and commingled with other garbage, Wright had not yet abandoned the property.

D.

We next address whether Heinz's conduct constituted a trespass thus making the warrantless search unconstitutional under article I, section 8. At the time of the founding, trespass was a broad concept that encompassed far more than physical intrusions into or on real or personal property. "Trespass, in its largest and most extensive sense, signifie[d] any transgression or offence against the law of nature, of society, or of the country in which we live; whether it relate[d] to a man's person, or his property." 3 William Blackstone, *Commentaries on the Laws of England* 208 (1768). Within the meaning of article I, section 8, an officer acts unreasonably when, without a warrant, the officer physically trespasses on protected property or uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited. *See*

Baude & Stern, 129 Harv. L. Rev. at 1825–26 ("[A] court should ask whether government officials have engaged in an investigative act that would be unlawful for a similarly situated private actor to perform. That is, stripped of official authority, has the government actor done something that would be tortious, criminal, or otherwise a violation of some legal duty? Fourth Amendment protection, in other words, is warranted when government officials either violate generally applicable law or avail themselves of a governmental exemption from it."). Otherwise prohibited conduct includes means and methods of general criminal investigation that violate a citizen's reasonable expectation of privacy as articulated in our cases adopting the *Katz* standard.

In determining whether an officer's conduct is unlawful, tortious, or otherwise prohibited, we do not rely on our personal biases, predilections, or normative judgments concerning the proper scope of law enforcement authority. Instead, we try "to discern and describe existing societal norms." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2265. One way to discern existing societal norms is to look to "democratically legitimate sources of [positive] law"—statutes, rules, regulations, orders, ordinances, judicial decisions, etc. *Id.* at ___, 138 S. Ct. at 2268 (quoting Todd E. Pettys, *Judicial Discretion in Constitutional Cases*, 26 J.L. & Pol. 123, 127 (2011)); *see also Planned Parenthood of the Heartland*, 915 N.W.2d at 248 ("Statutes do not serve as constitutional definitions but provide us the most reliable indicator of community standards to gauge the evolving views of society important to our analysis." (quoting *Griffin v. Pate*, 884 N.W.2d 182, 198 (Iowa 2016))).

### 1.

We turn to the question of whether Heinz physically trespassed on Wright's papers and effects. "[A]lmost every human activity ultimately

manifests itself in waste products . . . ." *Smith v. State*, 510 P.2d 793, 798 (Alaska 1973). Urbanization and advances in public sanitation practice necessitate regular, coordinated, and public trash collection and disposal. Many municipalities in Iowa have ordinances regulating the collection and disposal of trash. Clear Lake is one such municipality. The city limits who may access and collect solid waste to licensed and contracted collectors. *See* Clear Lake, Iowa, Code of Ordinances § 106.11. The city makes it "unlawful for any person to . . . [t]ake or collect any solid waste which has been placed out for collection on any premises, unless such person is an authorized solid waste collector." *Id.* § 105.11(4). Violation of any ordinance is punishable by a fine. *See id.* § 1.15.

Clear Lake is not the only municipality that prohibits any person, other than an authorized collector, from taking or collecting trash placed out for collection. *See* Ankeny, Iowa, Code of Ordinances § 110.11(3) (2008); Clinton, Iowa, Code of Ordinances § 50.11(D) (2009); Coralville, Iowa, Code of Ordinances § 105.11(4) (2011); Earlham, Iowa, Code of Ordinances § 105.10(4) (2017); Manchester, Iowa, Code of Ordinances § 105.10(4) (2017); Nevada, Iowa, Code of Ordinances § 105.10(4) (2006); North Liberty, Iowa, Code of Ordinances § 105.11(4) (2018); Pella, Iowa, Code of Ordinances § 105.12(4) (2011); Pleasant Hill, Iowa, Code of Ordinances § 105.12(3) (1998); Prairie City, Iowa, Code of Ordinances § 105.11(4) (2012); Sergeant Bluff, Iowa, Code of Ordinances § 105.11(4) (2011); Urbandale, Iowa, Code of Ordinances § 57.11(D) (2015); Walcott, Iowa, Code of Ordinances § 105.11(4) (2012).

As the Clear Lake and other ordinances demonstrate, Heinz engaged in means and methods of general criminal investigation with respect to these papers and effects that were unlawful and prohibited. *See McClurg*, 123 Iowa at 371–72, 98 N.W. at 882 ("The mere fact that a man is an

officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to . . . search for the evidences of crime, without a legal warrant procured for that purpose."); *see also Caniglia v. Strom*, 593 U.S. ___, ___, 141 S. Ct. 1596, 1599 (2021) ("And, of course, officers may generally take actions that 'any private citizen might do' without fear of liability." (quoting *Jardines*, 569 U.S. at 8, 133 S. Ct. at 1416)). Heinz's warrantless seizures and searches were thus an unlawful and unconstitutional physical trespass on Wright's papers and effects. *See Jardines*, 569 U.S. at 8, 133 S. Ct. at 1416; *Davis v. Passman*, 442 U.S. 228, 246, 99 S. Ct. 2264, 2277–78 (1979) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." (quoting *Butz v. Economou*, 438 U.S. 478, 506, 98 S. Ct. 2894, 2910 (1978))); Baude & Stern, 129 Harv. L. Rev. at 1882 (stating where municipal ordinances require trash collection by a licensed collector and prohibit unauthorized persons from tampering with trash, the ordinances "should bring with them the protection of the Fourth Amendment").

Of course, this is not to say article I, section 8 rises and falls based on a particular municipal law. Municipal laws, like all positive laws, are merely one form of evidence of the limits of a peace officer's authority to act without a warrant. Further, "while positive law may help establish a person's Fourth Amendment interest there may be some circumstances where positive law cannot be used to defeat it." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2270. For example, neither the legislature nor a municipality could "pass laws declaring your house or papers to be your property except to the extent the police wish to search them without cause." *Id.* at 2270–71. Article I, section 8 precludes a peace officer from engaging in general

criminal investigation that constitutes a trespass against a citizen's house, papers, or effects. No department of the government can circumvent this constitutional minimum.

2.

Although we have already concluded the seizures and searches at issue were unconstitutional physical trespasses on Wright's papers and effects, we address whether Heinz's conduct violated article I, section 8 because it violated a reasonable expectation of privacy. On this point, we do not write on a blank slate.

The Supreme Court applied the expectation-of-privacy test to address the constitutionality of the searches and seizures of garbage bags in *California v. Greenwood*, 486 U.S. 35, 108 S. Ct. 1625 (1988). There, the Supreme Court held the Fourth Amendment does not "prohibit[] the warrantless search and seizure of garbage left for collection outside the curtilage of a home." *Id.* at 37, 108 S. Ct. at 1627. The Court explained that "[a]n expectation of privacy does not give rise to Fourth Amendment protection . . . unless society is prepared to accept that expectation as objectively reasonable." *Id.* at 39–40, 108 S. Ct. at 1628. The Court reasoned an expectation of privacy in garbage bags left outside the curtilage of a home was not objectively reasonable: "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id.* at 40, 108 S. Ct. at 1628–29 (footnotes omitted). In addition, "respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *Id.* at 40, 108 S. Ct. at 1629.

In *State v. Henderson,* the Iowa Court of Appeals concluded the warrantless search and seizure of the garbage left outside the defendant's home under markedly similar facts as *Greenwood* did not violate the Fourth Amendment or article I, section 8. *See* 435 N.W.2d 394, 395–97 (Iowa Ct. App. 1988); *see also State v. Skola,* 634 N.W.2d 687, 691 (Iowa Ct. App. 2001) (declining to depart from the holdings in *Greenwood* and *Henderson* under article I, section 8 of the Iowa Constitution). The court of appeals relied on the Supreme Court's rationale in *Greenwood* and "determine[d] the use of evidence obtained by searching the defendant's garbage did not intrude upon his legitimate expectation of privacy and therefore, was properly considered by the magistrate in issuing a search warrant of the defendant's premises." *Henderson,* 435 N.W.2d at 397.

More recently, Justice Gorsuch called the application of *Katz* in *Greenwood* "unbelievable," explaining:

> In that case, the Court said that the homeowners forfeited their privacy interests because "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." But the habits of raccoons don't prove much about the habits of the country. I doubt, too, that most people spotting a neighbor rummaging through their garbage would think they lacked reasonable grounds to confront the rummager. Making the decision all the stranger, California state law expressly *protected* a homeowner's property rights in discarded trash. Yet rather than defer to that as evidence of the people's habits and reasonable expectations of privacy, the Court substituted its own curious judgment.

*Carpenter,* 585 U.S. at \_\_\_, 138 S. Ct. at 2266 (alteration in original) (citations omitted) (quoting *Greenwood,* 486 U.S. at 40, 108 S. Ct. at 1628–29).

We believe Justice Gorsuch has the better of the argument here. Garbage contains intimate and private details of life. *See Greenwood,* 486

U.S. at 50, 108 S. Ct. at 1634 (Brennan, J., dissenting). When a citizen places garbage out for collection in a closed garbage bag, the contents of the bag are private, as a factual matter. The citizen understands, however, that the contents of the bag may be revealed to someone at some point in time. That a citizen may actually lose privacy in certain things or in certain information at some point in the future does not preclude the possibility that a peace officer nonetheless violated the citizen's right to privacy in accessing the same things or information. "Privacy rights do not protect a reasonable expectation that privacy will be maintained, but rather a reasonable expectation that privacy will not be lost in certain ways." Jeffrey M. Skopek, *Untangling Privacy: Losses Versus Violations*, 105 Iowa L. Rev. 2169, 2174 (2020). As one noted scholar explained:

> Selective secrecy and partial confidentiality are wholly conceivable and not, despite the superficial allure of the argument to the contrary, internally inconsistent. Not to allow an individual to sacrifice a portion of her secrecy interest, or to suspend confidentiality vis-a-vis specific individuals and not others, without surrendering all claims to fourth amendment privacy, makes little sense.

James J. Tomkovicz, *Beyond Secrecy for Secrecy's Sake: Toward an Expanded Vision of the Fourth Amendment Privacy Province*, 36 Hastings L.J. 645, 681 (1985).

Here, Wright had an expectation based on positive law that his privacy, as a factual matter, would be lost, if at all, only in a certain, limited way. Specifically, Wright had an expectation based on positive law that his garbage bags would be accessed only by a licensed collector under contract with the city. *See* Clear Lake, Iowa, Code of Ordinances § 106.11. Wright had an expectation based on positive law that it would be unlawful for others to access his trash. *See id.* § 105.11(4); *see also Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, 430 n.12 (1978) ("Legitimation of

expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."). "[T]he mere fact that a citizen elects to dispose of his garbage in the customary way by making it available for pickup by a municipal or privately-retained hauler is no basis for concluding that his expectation of privacy as to that garbage is unjustified." 1 LaFave § 2.6(c), at 933. Heinz violated that expectation and right when he accessed the contents without a warrant.

We thus join those courts that have held a warrantless search of a citizen's trash left out for collection is unlawful. *See Edwards*, 458 P.2d at 718 (pre-*Greenwood* decision holding that police search of trash cans in the back of defendant's residence was unlawful because defendant had a justified expectation of privacy in his garbage); *State v. Goss*, 834 A.2d 316, 319 (N.H. 2003) (rejecting *Greenwood* under New Hampshire Constitution, concluding that defendant's expectation of privacy was reasonable, and construing state constitution to provide greater protection than the Federal Constitution); *State v. Hempele*, 576 A.2d 793, 813–15 (N.J. 1990) (rejecting *Greenwood* under New Jersey state constitutional law and holding that "the State must secure a warrant based on probable cause in order to search garbage bags left on the curb for collection"); *State v. Crane*, 254 P.3d 117, 123 (N.M. Ct. App. 2011) (finding defendant had reasonable expectation of privacy in garbage under New Mexico Constitution), *aff'd on other grounds*, 329 P.3d 689 (N.M. 2014); *State v. Morris*, 680 A.2d 90, 96 (Vt. 1996) (rejecting *Greenwood* under Vermont Constitution, finding that "[t]he Vermont Constitution does not require the residents of this state to employ extraordinary or unlawful means to keep government authorities from examining discarded private effects"); *State*

*v. Boland*, 800 P.2d 1112, 1116–17 (Wash. 1990) (en banc) (rejecting *Greenwood* under Washington Constitution and focusing its analysis on whether the private affairs of an individual were unreasonably violated).

E.

The State contends Heinz's conduct here was justified for practical reasons. The State contends that holding Heinz's conduct violated the constitution "would result in the demise of trash grabs of personal trash containers." We do not question the utility of warrantless trash grabs for the purposes of law enforcement, but the utility of warrantless activity is not the issue under our constitution. The "mere fact that law enforcement may be made more efficient can never by itself justify disregard of the [constitution]." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414 (1978). Obviously, "investigation of crime would always be simplified if warrants were unnecessary." *Id.*

> [T]he Constitution [is not] a public enemy whom judges are charged to disarm whenever possible. It is the protector of the people, placed on guard by them to save the rights of the people against injury . . . . To hold that attack upon it is for the public good is to commend the soldier for tearing down the rampart which enables him to sleep in safety.

*Hunter v. Colfax Consol. Coal Co.*, 175 Iowa 245, 272, 154 N.W. 1037, 1047 (1915).

V.

We hold Officer Heinz conducted an unreasonable search and seizure in violation of article I, section 8 of the Iowa Constitution when he acted without a search warrant and removed opaque trash bags from waste bins set out for collection behind a residence, took possession of the trash bags, transported them to a different location, opened the bags, and searched through the contents. Accordingly, we conditionally affirm Wright's convictions and remand this matter for further proceedings. On

remand, the district court shall hold a hearing on the defendant's motion to suppress evidence without consideration of the evidence and information obtained during the trash pulls used to support the warrant application. *See State v. Veal*, 930 N.W.2d 319, 340 (Iowa 2019) (conditionally affirming conviction and remanding for further proceedings in light of decision); *State v. Lilly*, 930 N.W.2d 293, 309 (Iowa 2019) (same). The district court shall conduct further proceedings as necessary contingent upon its ruling on the defendant's motion to suppress evidence.

**AFFIRMED ON CONDITION AND REMANDED WITH DIRECTIONS.**

Oxley and McDermott, JJ., join this opinion, and Appel, J., joins as to divisions I, IV(B)–(E), and V. Appel, J., files a special concurrence. Christensen, C.J., files a dissenting opinion, in which Waterman and Mansfield, JJ., join. Waterman, J., files a dissenting opinion, in which Christensen, C.J., and Mansfield, J., join. Mansfield, J., files a dissenting opinion, in which Christensen, C.J., and Waterman, J., join.

**APPEL, Justice (concurring specially).**

In this case, I join divisions I, IV(B), IV(C), IV(D), IV(E), and V of the court's opinion. In particular, I agree with Justice McDonald's general assertions regarding the fundamental importance of search and seizure law to our form of government. I also agree that we are not bound by the recent rights-restricting precedents of the United States Supreme Court in the area of search and seizure or other constitutional provisions. I further agree with Justice McDonald that the reasonableness clause does not encompass the radical pragmatism offered in the dissenting opinions. And, I agree that a trespass occurred in this case, that the property was not abandoned, and that, as a result, a warrant was required under article I, section 8 of the Iowa Constitution. In the alternative, the actions of the officers violated reasonable expectations of privacy, thereby triggering the protections of article I, section 8 of the Iowa Constitution.

But I disagree with aspects of Justice McDonald's opinion. Although I have a healthy respect for constitutional history and have explored it in some depth in the search and seizure context, *see, e.g., State v. Ochoa*, 792 N.W.2d 260, 264–87 (Iowa 2010), I am not what is generally loosely referred to as an originalist. The law is never static. It always evolves. And the founders certainly believed that to be the case.

And, in the context of search and seizure, Justice Brandeis got it right in his ultimately adopted dissent in *Olmstead v. United States*, when he urged the Court to view constitutional law as more than simple historical application of common law traditions in light of modern innovations like the telephone. 277 U.S. 438, 472–76, 48 S. Ct. 564, 570–71 (1928) (Brandeis, J., dissenting). It makes no sense to try to figure out what the founders would have thought about eavesdropping, a heat-

measuring device that penetrates the home, or a GPS device slapped onto a vehicle. Instead, our task is to identify the larger constitutional principles at stake, trace their evolution through decades of experience, and apply them in the present context based on contemporary realities.

Finally, as I have stated many times, the best reading of the relationship between the reasonability clause and the warrant clause in both article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution is the warrant-preference approach that appeared for decades in the United States Supreme Court cases until abandoned by modern pragmatists. The touchstone of the Fourth Amendment generally is not the reasonableness clause, but instead, is the warrant clause. The general rule, absent certain narrow and well-recognized exceptions, is that before law enforcement may engage in search or seizure of a person, papers, or effects, a warrant must be obtained describing with particularity the basis for probable cause, the person or places to be searched, and the scope of the search.

Here are some details.

**I.  The Critical Role of Search and Seizure Law in Maintaining a Democratic Government.**

Although often forgotten or simply ignored, the controversy involving search and seizure was at the heart of the American Revolution. The raw power of the government to engage in general searches and seizures was not a footnote to history but was a chapter title. Although modern radical pragmatists have forgotten it, the use of writs of assistance and general warrants were absolute anathema to the Revolutionary generation. General searches were recognized as opening the door to abuses, and abuses there were.

Of course, arbitrary search and seizure dragged innocent people through the wringer. But there was also larger harm that arose from the general authority to search and seize. General authority to search not only has the potential to harass the population generally, but it permits the government to act in an unequal and arbitrary manner against groups or types of persons. General authority to search and seize permits government authorities to focus the powerful machinery of law enforcement on political opponents, as in *Wilkes v. Wood* (1763) 98 Eng. Rep. 489, or upon some other element of the population that is disfavored or deemed suspicious. The need to cabin such arbitrary action gave rise to the warrant requirement in which the government is required to show probable cause and as history developed, obtain a warrant from a neutral magistrate.

More recently, the events of the 1930s in central Europe reinforced for all the importance of limitations on the government's search and seizure powers. These events had a particular impact on Justice Robert Jackson, who served as chief prosecutor at Nuremberg, and Justice Felix Frankfurter, born in Austria and of Jewish lineage. They recognized that a government that is free to conduct searches and seizures at any time of day or night for any reason, including political beliefs or ethnic characteristics, is an authoritarian government.

There is an ample supply of court opinions emphasizing the role of search and seizure limitations. Justice McDonald cites some of them. There are many others. Early on, we recognized that the search and seizure limitations of the Iowa Constitution were to be approached "in a broad and liberal spirit." *State v. Height*, 117 Iowa 650, 657, 91 N.W. 935, 937 (1902). In its first major Fourth Amendment case, the United States Supreme Court urged "constitutional provisions for the security of person

and property should be liberally construed," cautioned that unconstitutional practices arise from "slight deviations from legal modes of procedure," and observed that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535 (1886). And traditional search and seizure cases emphasize that concerns about efficiency cannot defeat search and seizure protections. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414 (1978) ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of [constitutional search and seizure requirements].").

But what is striking is not the cornucopia of powerful expressions of the role of search and seizure limitations, but their absence in the dissenting opinions, and unfortunately, in many of the recent rights-restricting search and seizure decisions of the United States Supreme Court and this court. The term Justice Stevens used for this phenomenon is "constitutional amnesia." *United States v. Leon*, 468 U.S. 897, 972, 104 S. Ct. 3430, 3452 (1984) (Stevens, J., dissenting). But without a general understanding of the purpose of a constitutional provision and its historical roots, a judicial opinion becomes a color matching race to the finish without context and substance.

## II. Authority to Depart from Federal Precedent.[6]

Although in the early years the federal government was regarded as something of an irrelevant backwater compared to sophisticated and experienced state governments, in recent years, there seems to be a

---

[6]For more expansive views on the subject see *State v. Short*, 51 N.W.2d 474, 481–95 (Iowa 2014); *State v. Baldon*, 829 N.W.2d 785, 803–34 (Iowa 2013) (Appel, J., specially concurring); and *Ochoa*, 792 N.W.2d at 264–67.

fascination, in some quarters, of all things federal. Fascination with federal court constitutional limitations. Fascination with federal rules. Fascination with the federal doctrine on just about anything, regardless of context. Law students flock to the federal courts class and avoid the course on state and local government.

This fascination with all things federal by state courts would have certainly left the founding generation speechless, if not breathless. The very purpose of the federal system was to preserve the autonomy of the states, with the federal government playing a limited role in national political life. Not only was uniformity between state and federal government not desired, the structure of the government was intentionally designed to prevent it by giving states wide autonomy over most aspects of public life. The proposition that state supreme courts should generally follow precedent of the United States Supreme Court would not have commanded support at the United States Constitutional Convention[7] and was clearly condemned by the Iowa constitutional generation's reaction to federal caselaw regarding slavery at the Iowa Constitutional Convention of 1857 and in the general assembly's response to the *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393 (1857), decision issued shortly after the convention adjourned.[8]

---

[7]United States Constitutional Convention delegate "Oliver Ellsworth, who would one day become Chief Justice of the United States Supreme Court, declared that 'he turned his eyes' to the state governments 'for the preservation of his rights.'" Paul Finkelman & Stephen E. Gottlieb, *Introduction* to *Toward a Usable Past: Liberty Under State Constitutions* 1, 4 (Paul Finkelman & Stephen E. Gottlieb eds., 1991).

[8]At the Iowa Constitutional Convention of 1857 it was widely recognized that provisions of the Iowa Constitution conflicted with decisions of federal courts. That did not bother the members of the convention. Regarding the possibility of conflict between the right to counsel provision and judicial holdings under the Federal Fugitive Slave Act, James F. Wilson noted, "Gentlemen may say that it will bring about a conflict between the courts of the United States and the courts of this State. Let that conflict come . . . ." 2 *The Debates of the Constitutional Convention of the State of Iowa* 739 (W. Blair Lord rep., 1857), https://www.statelibraryofiowa.org/services/collections/law-library/iaconst.

There is only one reason to follow federal precedent on a matter of state law, namely, when it is persuasive on the merits, period. *Ochoa*, 792 N.W.2d at 267. We look to the quality of the reasoning, not the pedigree of the court, in considering the impact of caselaw from other jurisdictions. *Id.*

Some may view it desirable to tip the scales of Iowa caselaw in the direction of the recent rights-restricting cases of the United States Supreme Court. Upon this view, the dramatic recent rights-restricting trends in the federal caselaw may be imported into Iowa law. By giving a preference or presumption to federal law generally, one can dramatically move state law in an across-the-board, rights-restricting direction. A federal rights-restricting thumb is placed on the scale of all state constitutional cases. As noted by Professor Adrian Vermeule, such an approach amounts to "a 'precommitment device' that prevents a state supreme court from considering each case based on an independent examination of facts and law." *State v. Short*, 851 N.W.2d 474, 487 (Iowa 2014) (quoting Adrian Vermeule, *The Judicial Power in the State (and Federal) Courts*, 2000 Sup. Ct. Rev. 357, 366).

But we have a constitutional responsibility to think for ourselves. Our famous civil rights cases were not clones of federal court precedent.

---

Similarly, George Ells, a leading figure at the convention, told delegates, "I regard the Fugitive Slave Law as unconstitutional, because it does not give to man the right to defend his life and liberty by 'due process of law.'" 1 *id.* at 101. He later told the convention, "If the words 'due process of law,' shall in time be recognized by our judicial tribunals to mean what they really do mean, . . . [t]hen, sir, that infamous Fugitive Slave Law will become a nullity, and the American people will trample its odious enactments in the dust." *Id.* at 102. These views, of course, were completely contrary to the pro-slavery-dominated United States Supreme Court. *Compare id.* at 101–02, *and* 2 *id.* at 739, *with Dred Scott*, 60 U.S. (19 How.) at 404, 452–53, *superseded by constitutional amendment*, U.S. Const. Amend. XIII. The Iowa General Assembly wasted no time responding to *Dred Scott*, declaring that it was obligated to "promptly and sternly denounce this new doctrine, which if established, degrades the free States." 1858 Iowa Acts Res. 12, at 433.

When the United States Supreme Court decided *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138 (1896), we did not scamper back from our rights-affirming rulings in *Clark v. Board of Directors*, 24 Iowa 266 (1868), and *Coger v. Northwestern Union Packet Co.*, 37 Iowa 145 (1873), as a chastised inferior tribunal. This court has not been, and should not aspire to be, the United States Court of Appeals for the Twelfth Circuit.

The second reason for cutting and pasting federal precedent into state caselaw, rarely articulated but often at work, is efficiency. State courts are, of course, overburdened, and the resources available to the average state court judge, in Iowa and in many states, pales in comparison to the federal judiciary. The parties' briefings on state constitutional issues are often less than thorough. It is easy to simply grab a flying federal case asteroid, drop the smoldering object into our opinion book, close it quickly to cut off any legal oxygen that might cause a flare-up, and go home for supper. But the Iowa courts are an independent state judiciary operating under an independent state constitution.

From an analytical perspective, these issues are well settled. There is a large scholarship supporting these views which we have canvassed in some detail. *See Short*, 851 N.W.2d at 481–95; *State v. Baldon*, 829 N.W.2d 785, 803–34 (Iowa 2013) (Appel, J., specially concurring); *Ochoa*, 792 N.W.2d at 264–67. Writing in 1998, a leading authority declared that "the legitimacy of rel[ying] on state constitutional guarantees . . . has largely been put to rest." G. Alan Tarr, *Understanding State Constitutions* 169 (1998). A recent book by Judge Jeff Sutton demolished the argument that state courts should simply follow federal law. Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (2018). Yet, at least some of our recent cases in my view tend to follow federal caselaw uncritically as if it were some kind of special authority.

*See, e.g., State v. McGee,* ___ N.W.2d ___, ___ (Iowa 2021); *State v. Warren,* 955 N.W.2d 848, 859 (Iowa 2021); *State v. Brown,* 930 N.W.2d 840, 846–47 (Iowa 2019). "Old habits die hard." A.E. Dick Howard, *Introduction* to *Developments in State Constitutional Law* XI, XXII (Bradley D. McGraw ed., 1985).

### III. Departure from Federal Precedent.

Having demonstrated our independent authority, I now briefly review what I regard as the unsatisfactory approach to search and seizure matters by the United States Supreme Court. In my view, more than a few of them are off the mark. Until very recently, the Supreme Court has tended to embrace rights-restricting radical pragmatism, where the perceived needs of law enforcement are consistently permitted to overwhelm the libertarian principles behind search and seizure law. I offer a nonexclusive parade of examples to illustrate my point.

In *United States v. Leon,* the Supreme Court discovered a "good-faith" exception to the exclusionary rule for search and seizure cases. 468 U.S. at 920–21, 104 S. Ct. at 3419 (majority opinion). The decision promised to undermine enforcement of search and seizure protections in federal courts. In *State v. Cline,* we rejected the good-faith exception as developed in *Leon.* 617 N.W.2d 277, 288–93 (Iowa 2000) (en banc). We found that in Iowa the exclusionary rule was not only designed to deter police misconduct but also to provide a remedy for constitutional violations and to ensure the integrity of our state courts by refusing to admit into the record illegally obtained evidence. *Id.* at 289–90. A majority of state courts that have considered *Leon* have also rejected it,[9] leading

---

[9]*See Short,* 851 N.W.2d at 503 (citing cases).

commentators to speculate that perhaps the United States Supreme Court would overrule *Leon*.

In *Samson v. California*, the United States Supreme Court departed from its prior precedent by creating a categorical exception that permitted warrantless searches of parolees. 547 U.S. 843, 850–57, 126 S. Ct. 2193, 2198–2202 (2006). The new Fourth Amendment doctrine dramatically and substantially undercut the traditional warrant requirement, probable cause, and particularity requirements of search and seizure law. *See Short*, 851 N.W.2d at 500. This departure from past precedent was contrary to *State v. Cullison*, where we held that a parolee did not surrender search and seizure protections. 173 N.W.2d 533, 537, 539–40 (Iowa 1970). In *Cullison*, we rejected pragmatic arguments to undermine traditional search and seizure law as "socio-juristic rationalization." *Id.* at 536. A leading Fourth Amendment scholar, Wayne LaFave, found *Samson* unpersuasive, noting its use of a general reasonability analysis "especially troublesome." *See* 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10, at 541 (6th ed. 2020). We agreed, stating that "[w]e bristle at the replacement of a regime of individualized suspicion with broad categorical judgments when general law enforcement searches of the home are involved." *Ochoa*, 792 N.W.2d at 289.

In *Schneckloth v. Bustamonte*, the United States Supreme Court developed a multifactor test to determine whether a person consents to a search. 412 U.S. 218, 227, 93 S. Ct. 2041, 2048 (1973). *Schneckloth* does not require the state to show a knowing and voluntary waiver of search and seizure rights under *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938), but instead permits consideration of factors not related to the consent issue at all, which does not make any sense except to permit searches or seizures that are not knowing and voluntary and not

supported by a warrant. And, how do you meaningfully consent to waiving a right that you are not aware you have? In *Schneckloth*, the naked assertion was made that providing explicit warnings would be "thoroughly impractical." 412 U.S. at 231, 93 S. Ct. at 2050. Subsequent practice, however, shows that not to be the case at all. *See* Matthew Phillips, Note, *Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable*, 45 Am. Crim. L. Rev. 1185, 1197–1206 (2008) (citing New Jersey requirement of giving warnings in any routine traffic stop prior to seeking consent to search). Although we have not explicitly required that a police officer inform a person of his or her right to decline to provide consent, we have stated that the failure to make such a disclosure is an important fact in the "consent" analysis. *State v. Pals*, 805 N.W.2d 767, 783 (2011).

The result in *Atwater v. City of Lago Vista* is something of a shocker. 532 U.S. 318, 354–55, 121 S. Ct. 1536, 1557–58 (2001). There, a mother driving with her two young children was arrested and jailed after a traffic offense where no jail time could be imposed. *Id.* at 323–24, 121 S. Ct. at 1541–42. How can that be? Justice O'Connor's dissent in *Atwater* has been widely praised and should be read and reread by those seriously concerned about search and seizure law. *Id.* at 361, 121 S. Ct. at 1536 (O'Connor, J., dissenting). *See generally* Wayne A. Logan, *Reasonableness as a Rule: A Paean to Justice O'Connor's Dissent in* Atwater v. City of Lago Vista, 79 Miss. L.J. 115 (2009) (praising Justice O'Connor's dissent "for its steadfast fidelity to Fourth Amendment reasonableness and its astute recognition of the personal and jurisprudential consequences of its abandonment").

The notion that search and seizure protections do not extend to financial records in the hands of third parties, as declared in *United States v. Miller*, 425 U.S. 435, 440–44, 96 S. Ct. 1619, 1622–24 (1976), strikes

me as doubtful in the modern context. John Adams kept his financial records in a roll-top desk on his farm and therefore the records were protected from unwarranted search. But in modern life, John Adams would have the very same information in records in a financial institution. Shouldn't the identical information stored according to modern practices be entitled to the same protection? Fortunately, it seems that the United States Supreme Court is beginning to backtrack on the third-party doctrine. *See Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2216–20 (2018). As noted by Justice Sotomayor in *United States v. Jones*, it may be time to reconsider *Miller*. 565 U.S. 400, 417, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring) (noting that the *Miller* "approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks").

In *Whren v. United States*, the United States Supreme Court expressly permitted law enforcement officers to engage in pretextual traffic stops. 517 U.S. 806, 811–13, 116 S. Ct. 1769, 1773–74 (1996). *Whren* failed to recognize, among other things, that discriminatory application of search and seizure powers of the state was one of the fundamental purposes of the Fourth Amendment. For me, this was an unwelcome development of federal search and seizure law that leaked into Iowa law under the Iowa Constitution. *See Brown*, 930 N.W.2d at 873–76 (Appel, J., dissenting).

In *New York v. Belton*, the United States Supreme Court held that law enforcement as part of a search incident to arrest could look inside closed containers as part of a vehicle search. 453 U.S. 454, 459–61, 101 S. Ct. 2860, 2864 (1981). This was so even though the person arrested did not have access to the container and thus there was no risk of

destruction of evidence nor any question of safety of the officers. *Id.* at 456, 101 S. Ct. at 2862. Many state courts howled. So did we. *State v. Gaskins*, 866 N.W.2d 1, 9–13 (Iowa 2015); *State v. Vance*, 790 N.W.2d 775, 786–90 (Iowa 2010). Justice Scalia noted that the Supreme Court caselaw assumed that the arrested person had "the skill of Houdini and the strength of Hercules." *Thornton v. United States*, 541 U.S. 615, 626, 124 S. Ct. 2127, 2134 (2004) (Scalia, J., concurring in the judgment) (quoting *United States v. Frick*, 490 F.2d 666, 673 (5th Cir. 1973) (Goldberg, J., concurring in part and dissenting in part)). Citing state court decisions refusing to follow *Belton*, the United States Supreme Court backtracked, to a large extent, in *Arizona v. Gant.* 556 U.S. 332, 343, 129 S. Ct. 1710, 1719 (2009). The retreat was certainly stimulated by the growing body of negative state court response to *Belton*.

In a line of three cases, the United States Supreme Court reversed state supreme court decisions extending traditional search and seizure protections to inventory searches of automobiles, *see Colorado v. Bertine*, 479 U.S. 367, 376, 107 S. Ct. 738, 743 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 648–49, 103 S. Ct. 2605, 2611 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S. Ct. 3092, 3100 (1976). In considering the approach of the United States Supreme Court on inventory searches, we noted the cumulative impact of its decisions in *Whren*, *Atwater*, and *Bertine* was to provide law enforcement with "virtually unlimited discretion to stop arbitrarily whomever they choose, arrest the driver for a minor offense that might not even be subject to jail penalties, and then obtain a broad inventory search of the vehicle—all without a warrant." *State v. Ingram*, 914 N.W.2d 794, 814 (Iowa 2018). We noted that "[a]n essentially unregulated legal framework allowing wide police discretion in stopping, arresting, and conducting warrantless inventory searches of the driver's

automobile amounts to a general warrant regime that is anathema to search and seizure law." *Id.* at 815.

Finally, there is the evisceration of the warrant requirement in *Mitchell v. Wisconsin,* 588 U.S. ___, ___, 139 S. Ct. 2525, 2535–39 (2019). Under *Mitchell,* administrative efficiency now is the driving force behind the determination of whether the warrant requirement applies. *See id.* And, as in *Samson,* the Supreme Court utilized an overbroad categorical approach to remove cases from the warrant requirement even though it was not impractical to obtain a warrant. *See McGee,* ___ N.W.2d at ___ (Appel, J., dissenting).

In sum, as the above cases illustrate, the recent rights-restrictive cases of the United States Supreme Court have seriously undermined the traditional protections of search and seizure. If we are to give article I, section 8 of the Iowa Constitution the "broad and liberal" construction commanded by our precedent, *State v. Height,* 117 Iowa at 657, 91 N.W. at 937, many of the United States Supreme Court cases simply cannot be relied upon as a sound basis for Iowa constitutional law. There is, perhaps, some reason to believe that the warrant requirement may be making a comeback in the United States Supreme Court, at least in some contexts. *See Carpenter,* 585 U.S. at ___, 138 S. Ct. at 2216–20. We need not await these perhaps mercurial strands in a couple of United States Supreme Court cases, however, but should simply stay the course with the development of our robust and independent state search and seizure law.

## IV.  Benefits of History, but Shortcomings of Originalism.

I also wish to briefly comment on methodology. Historical understanding of the development of search and seizure law helps inform our analysis of current problems. In several cases, we canvassed at length

the historic origins of search and seizure law. *See Baldon*, 829 N.W.2d at 803–34; *Ochoa*, 792 N.W.2d at 269–73.

But while historical inquiry can inform us about the general purpose of a constitutional provision or about the historic concerns that gave rise to open-ended constitutional language, it does not provide us, standing alone, with inevitable answers. History is not granular, and it rarely points only in one direction. Even if historical truths can be discovered by judges writing opinions in a matter of weeks (and, alas, sometimes days), the historical truths are very difficult even for trained historians to discover and are often inconsistent and contradictory. And, historical cherry-picking can be a tool to hide preferences and biases behind a veneer of objectivity. At most, and when best used, history informs and shapes the inquiry but does not demand results in cases presenting fact situations or modern technology that the founders could not possibly have anticipated. In addition to history, consideration must be given to the evolving precedent interpreting open-ended constitutional provisions and to contemporary contexts and public attitudes.

We also should avoid search and seizure formalism. While a trespass may give rise to search and seizure protections, nontrespassory acts that uncover intimate information may be equally protected from arbitrary search and seizure. *Jones*, 565 U.S. at 414, 132 S. Ct. at 954–55. In other words, the government's physical intrusion may be important in some cases, but there are many kinds of surveillance and intrusions that do not involve trespass that are entitled to protection against warrantless government invasion. *Id.* Even without a trespass, "unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse . . . [and] may 'alter the relationship between citizen and government in a way that is inimical to democratic

society.' " *Id.* at 416, 132 S. Ct. at 956 (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

Particularly in the area of search and seizure, there have been technological developments that simply could not have been anticipated by the founders. History may not be determinative in these contexts, nor can the formalism of property law, in and of itself, be sufficient. That point was made by Justice Brandeis in his dissent in *Olmstead*, 277 U.S. 438, 48 S. Ct. 564, and later embraced by the United States Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967). But even so, it is clear that the property rights theory which relies, to some extent, on historical patterns was not entirely abandoned by *Katz*; but instead, *Katz*'s "reasonable expectation of privacy" was grafted onto existing doctrine to ensure robust search and seizure protections. The *Katz* "reasonable expectation of privacy" doctrine, however, seemed to engulf prior concepts limiting the government's authority to search and seize. Further, although *Katz* was seen at the beginning as a tool to expand search and seizure protections, narrow interpretations of the pliable term "reasonable" often produced contrary results. In any event, I regard the protections afforded by search and seizure law to be expansive and broad enough to include evolving concepts of property, privacy, and security. *See Ochoa*, 792 N.W.2d at 276–78 (discussing interest of security as well as property and privacy in search and seizure law).

**V. Constitutionality of Trash Pulls in This Case.**

I have little trouble concurring with the result in this case. For the reasons explained by Justice McDonald, the trash pull was clearly a search. There are two reasons for this. First, as Justice McDonald explains, the search was accomplished by trespass. In my view, a trespass may not be required to offend search and seizure principles, but where a

trespass does occur, the government must either get a warrant or be able to meet its burden of showing an exception to the warrant requirement. Second, as Justice McDonald also notes, applying the formulation in *Katz*, Wright had a legitimate expectation of privacy in his trash. This is a belt-and-suspenders case.

At this point, then, the warrant requirement becomes applicable unless there is an exception to it. *See, e.g., Ingram*, 914 N.W.2d at 816 ("Our recent cases repeatedly embrace what can only be characterized as a strong warrant preference interpretation of article I, section 8."); *State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017) (articulating warrant preference); *Gaskins*, 866 N.W.2d at 7 (" 'A warrantless search is presumed unreasonable' unless an exception applies." (quoting *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997))); *Baldon*, 829 N.W.2d at 791 (majority opinion) ("It is well-settled that warrantless searches are virtually 'per se unreasonable' . . . ." (quoting *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043)); *Ochoa*, 792 N.W.2d at 269 ("[T]he Reasonableness Clause cannot be used to override the Warrant Clause."); *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992) ("Warrantless searches and seizures are by definition invalid unless they fall under one of the jealously and carefully drawn exceptions to constitutional warrant requirements."); *State v. Sanders*, 312 N.W.2d 534, 538 (Iowa 1981) ("Ordinarily a search and a resulting seizure of private property 'must be both reasonable and performed pursuant to a properly executed warrant.' " (quoting *State v. Holderness*, 301 N.W.2d 733, 736 (Iowa 1981))). No one suggests that such an exception is present in this case. As a result, I join the court in concluding that the unwarranted search is unlawful under article I, section 8 of the Iowa Constitution and the evidence obtained from the search must be suppressed.

**CHRISTENSEN, Chief Justice (dissenting).**

I respectfully dissent and join the separate dissents of Justice Waterman and Justice Mansfield. I would affirm the district court judgment. The majority buries the lede in waiting until the last portion of its opinion to announce the most consequential portion of its ruling, which is that police are apparently now prohibited from utilizing any "means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited" if those means or methods "would be unlawful for a similarly situated private actor to perform." I wish our state law enforcement officials the best of luck in trying to decipher what methods of criminal investigation and exceptions to the warrant requirement are now available to them in light of that conclusion.

In my opinion, the Iowa Constitution does not provide greater protections than the Fourth Amendment to the United States Constitution for the warrantless search of garbage set out for collection in a publicly accessible area such that the defendant had a reasonable expectation of privacy in his garbage. Additionally, the defendant's garbage is not a constitutionally protected "effect" under the Federal and State Constitutions, so I cannot conclude the officer violated Wright's search and seizure protections by retrieving Wright's garbage.

**I. The Parties' Actual Arguments on Appeal.**

Wright's argument is twofold. First, Wright asks us to interpret article I, section 8 of the Iowa Constitution to provide greater protections than the Fourth Amendment in garbage set out for collection in a publicly accessible area based on his belief that Iowans have an objectively reasonable expectation of privacy in garbage set out for collection in a publicly accessible area. Second, Wright maintains Officer Heinz's

warrantless search of the garbage violated the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution regardless of any privacy expectation because Officer Heinz trespassed on Wright's personal "effects" to obtain information.

In the past decade alone, our court has had no shortage of cases examining whether we should depart from the United States Supreme Court's Fourth Amendment precedent to provide Iowans with greater search and seizure protections under article I, section 8 of the Iowa Constitution in various contexts. *See, e.g., State v. Brown*, 930 N.W.2d 840, 846–54 (Iowa 2019); *State v. Gaskins*, 866 N.W.2d 1, 6–16 (Iowa 2015); *State v. Short*, 851 N.W.2d 474, 481–507 (Iowa 2014). In those cases, we considered an array of nonexclusive factors in deciding whether to depart from federal precedent, such as the text of the Iowa Constitution; the history of our state constitutional provision; the structural differences in the State and Federal Constitutions; related decisions of other states, especially when interpreting similar constitutional text; and the practical consequences of departure. *See, e.g., Brown*, 930 N.W.2d at 846–54 (examining evidence from the debates over the Iowa Constitution, the scope of our State and Federal Constitutions and relevant precedent involving them, the practical issues in departing from the Federal Constitution, and related precedent from other states in declining to depart from the Fourth Amendment regarding the relevance of an officer's motivations for stopping motorists); *Gaskins*, 866 N.W.2d at 6–16 (same in the context of vehicle search incident to arrest); *Short*, 851 N.W.2d at 481–507 (same in the context of home search of probationer based on reasonable suspicion of criminal activity). Meanwhile, Wright does not discuss any of those considerations.

Instead, Wright's argument about privacy expectations relies exclusively on the City of Clear Lake's ordinances regulating waste management. Specifically, Wright's argument in the section of his brief advocating for departure from the federal precedent in *California v. Greenwood*, 486 U.S. 35, 108 S. Ct. 1625 (1988), spans the following few sentences:

> Not only was there a trespass on the containers to search for information, but Appellant, like so many other Iowans across the state, has an objectively reasonable expectation of privacy codified by municipal code. It is against the law in Clear Lake, Iowa for any person to scavenge garbage, which completely undermines the rationale in *Greenwood* that garbage is knowingly exposed to "children, scavengers, snoops and other members of the public." Under these ordinances, the contents of an individual's garbage inside the container remain private. Appellant can expect the privacy of his garbage will be maintained up to the point where the licensed collector physically takes possession of his garbage bags.

It is important to note what Wright *did not argue* in his brief. Wright's brief never so much as cited *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206 (2018), despite the majority's reliance upon it, let alone argued that it formed a basis for rejecting *Greenwood*. Understandably, the State did not discuss or even cite *Carpenter* because it was under the impression that it was fighting the case on other issues. Instead of asking us to overrule the Iowa precedent following *Greenwood*, Wright's brief asks us to depart from it under the Iowa Constitution based on ordinances regulating waste management. This is a substantially different argument than asking us to disregard *Greenwood* because it is no longer the controlling Supreme Court precedent on this issue. "[W]e do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change." *Feld v. Borkowski*, 790 N.W.2d 72, 78 n.4 (Iowa 2010).

Nor do we address arguments raised for the first time on appeal, *see State v. Derby*, 800 N.W.2d 52, 60 (Iowa 2011), but that is what the majority does in declaring, "an officer acts unreasonably when, without a warrant, the officer . . . uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited." Although Wright cites Clear Lake ordinance 30.08 in his appellate brief, which states, "The Police Chief shall establish such rules, not in conflict with the Code of Ordinances, and subject to the approval of the Council, as may be necessary for the operation of the department," he never presented this ordinance or argument in support of his claim before the district court. Clear Lake, Iowa, Code of Ordinances § 30.08 (2003). Thus, he failed to preserve it for our review. *Derby*, 800 N.W.2d at 60. Nonetheless, as I will discuss later, police have privileges at their disposal to carry out their duties that ordinary citizens lack. *See, e.g.*, *State v. Lloyd*, 513 N.W.2d 742, 745 (Iowa 1994) (discussing means police officers have to arrest an individual that private citizens lack, including the ability of police to engage "in the dangerous pursuit of other vehicles" that might violate traffic laws). That Officer Heinz's actions may have violated or conflicted with a city ordinance does not automatically render his actions illegal, let alone a violation of Wright's constitutional rights.

Although *Carpenter* was discussed during oral argument through questioning from members of our court, "we do not consider issues raised for the first time in oral argument." *Dilley v. City of Des Moines*, 247 N.W.2d 187, 195 (Iowa 1976) (en banc); *see also Principal Mut. Life Ins. v. Charter Barclay Hosp., Inc.*, 81 F.3d 53, 56 (7th Cir. 1996) (noting that it "would not be quite cricket" to decide a case on a ground that had not been raised at all before oral argument of the appeal). In any event, Wright's counsel was not the one to invoke *Carpenter*. Rather, Justice Appel precipitated

the discussion on this unbriefed argument, and he did so only in questioning the State. It was clear from the oral argument that the State was justifiably caught off guard and ill-prepared to address Justice Appel's approach, and the State was unfairly deprived of its ability to properly brief and argue this case due to the majority's decision to depart from the arguments presented on appeal. Similarly, Justice McDonald initiated the discussion on Wright's unpreserved argument about the ability of police officers to engage in actions that exceed the ability of private citizens (or in the words of his majority opinion, the ability of the police to use "means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited"), and this, too, was only in questioning the State. Consequently, the majority's analysis is almost entirely its own without regard for the parties' actual arguments.

"[T]he adversary process functions most effectively when we rely on the initiative of lawyers, rather than the *activism* of judges, to fashion the questions for review." *New Jersey v. T.L.O.*, 468 U.S. 1214, 1216, 104 S. Ct. 3583, 3585 (1984) (Stevens, J., dissenting) (emphasis added). "Our law clerks and judges should not be doing the work of counsel . . . . We are not advocates and should not usurp a party's strategy." *King v. State*, 818 N.W.2d 1, 48 (Iowa 2012) (Wiggins, J., dissenting) (citation omitted); *see also United States v. Wagner*, 103 F.3d 551, 552 (7th Cir. 1996) (noting it is "not a sound practice" for the court and its law clerks or staff attorneys to flag issues the defendant could have raised but did not). Luckily for Wright, his strategy did not matter because the majority was willing to make the arguments that he did not make. Given the majority's generosity and willingness to make arguments not briefed or preserved, I fail to see how members of the majority can continue to assert in criminal cases that defendants have "waived" state constitutional arguments on appeal under

the rationale that those defendants did not cite authority or adequately brief the issue. *See State v. Gibbs*, 941 N.W.2d 888, 902 (Iowa 2020) (McDonald, J., concurring specially in the judgment, joined by Oxley, J.) ("In this case, Gibbs waived his argument arising under the Iowa Constitution. The entirety of the defendant's argument in support of his state constitutional claim is two sentences. . . . While Gibbs identified a state constitutional claim, he did not make more than a perfunctory argument in support of the state constitutional claim, and he did not cite any authority in support of his state constitutional claim. Gibbs's perfunctory argument without citation to any authority constitutes waiver of his state constitutional claim.").

> The public has criticized this court for reaching out and deciding issues not raised or briefed on appeal. This is another case for the critics to add to their list. We cannot have a rule of law that we reach out and decide an issue not briefed or pressed by the parties on appeal in order to achieve a desired result.

*King*, 818 N.W.2d at 48.

Nevertheless, even if the majority was correct in concluding Wright properly argued that *Carpenter* forms the basis for rejecting *Greenwood*, I would still affirm the district court's suppression ruling and Wright's subsequent conviction on the merits for the reasons discussed below.

**II. The District Court's Ruling Should be Affirmed Under Existing Iowa and Federal Precedent.**

The majority departs from federal decisions and overturns Iowa caselaw adopting those decisions based on various United States Supreme Court Justices' dissenting or concurring opinions. Perhaps the more recent shift in the makeup of the Supreme Court over the past few years now favors overturning *Greenwood*, abandoning the *Katz* test, and recognizing constitutional protections for garbage placed in a publicly

accessible area for collection. But, "each of the Justices on the *Carpenter* Court, including those in the majority and all of the dissenters, has, at some point, either authored or joined an opinion critical of *Katz*, or at least conceding the difficulty of applying it[]," yet *Katz* still served as the foundation for the Court's decision in *Carpenter.* Nicholas A. Kahn-Fogel, Katz, Carpenter*, and Classical Conservatism*, 29 Cornell J.L. & Pub. Pol'y 95, 106 (2019). "[N]otwithstanding Justice Thomas's protestations and Justice Gorsuch's doubts, the *Katz* standard is, for now, alive and well," as is *Greenwood*, and it is not for us to decide that is no longer the case simply because we think another approach is "better." *Id.* at 97 (footnote omitted).

**A. The Expectation of Privacy in Garbage Set Out for Collection in a Publicly Accessible Area.** The Fourth Amendment to the United States Constitution protects individuals from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."); *see also United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 949 (2012). Similarly, article I, section 8 of the Iowa Constitution protects persons against "unreasonable seizures and searches" of "their persons, houses, papers and effects." Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause . . . ."). "We generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment' " due to their almost identical language while remaining cognizant of our duty to

interpret the Iowa Constitution independently. *Brown*, 930 N.W.2d at 847 (quoting *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008)).

Although we have not addressed the constitutionality of a warrantless search or seizure of garbage left for collection in a publicly accessible area, both the United States Supreme Court and the Iowa Court of Appeals have done so under similar facts as this case. In *Greenwood*, a police investigator received information that the respondent might be engaged in narcotics trafficking, so the investigator asked the neighborhood's regular trash collector to pick up the garbage bags that the respondent had left on the curb in front of his home and turn them over to her. 486 U.S. at 37, 108 S. Ct. at 1627. The investigator searched through the garbage bags, found items in the bags indicative of narcotics use, and used the information she gleaned from the garbage search to support her application for a search warrant of the respondent's home that led to the respondent's arrest on felony charges. *Id.* at 37–38, 108 S. Ct. at 1627–28.

The Supreme Court held the Fourth Amendment did not prohibit the warrantless search and seizure of garbage left for collection outside the curtilage of a home because "society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public." *Id.* at 41, 108 S. Ct. at 1629. The Court explained, "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id.* at 40, 108 S. Ct. at 1628–29 (footnotes omitted). Further, the Court noted the respondent had placed his garbage "at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through" it or given it to others to sort. *Id.* at 40, 108 S. Ct. at 1629. Therefore, the

Court reasoned, he could not have any reasonable expectation of privacy in the garbage left for collection because he had deposited it "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it." *Id.* at 40–41, 108 S. Ct. at 1629 (quoting *United States v. Reicherter*, 647 F.2d 397, 399 (3d. Cir. 1981)). Finally, the Court declared that "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public," as the Fourth Amendment does not protect such activity that a person knowingly exposes to the public. *Id.* at 41, 108 S. Ct. at 1629.

Similarly, in *State v. Henderson*, the Iowa Court of Appeals concluded the warrantless search and seizure of garbage left outside the defendant's home under markedly similar facts as *Greenwood* did not violate the Fourth Amendment to the United States Constitution or article I, section 8 of the Iowa Constitution. 435 N.W.2d 394, 396–97 (Iowa Ct. App. 1988); *see also State v. Skola*, 634 N.W.2d 687, 691 (Iowa Ct. App. 2001) (declining to depart from the holdings in *Greenwood* and *Henderson* under article I, section 8 of the Iowa Constitution). The court of appeals relied on the Supreme Court's rationale, agreeing with the Supreme Court that there was no societal understanding that garbage left for collection in an area accessible to the public deserved "scrupulous protection from government invasion." *Henderson*, 435 N.W.2d at 396 (quoting *Oliver v. United States*, 466 U.S. 170, 178, 104 S. Ct. 1735, 1741 (1984)). Consequently, the court of appeals "determine[d] the use of evidence obtained by searching the defendant's garbage did not intrude upon his legitimate expectation of privacy and therefore, was properly considered by the magistrate in issuing a search warrant of the defendant's premises." *Id.* at 397.

In those cases, both the Supreme Court and the court of appeals based their conclusions on the reasonable-expectation-of-privacy test originally derived from Justice Harlan's concurrence in *Katz v. United States*, which declared that the Fourth Amendment only protects a person's "reasonable expectation of privacy." 389 U.S. 347, 360, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring); *see also Oliver*, 466 U.S. at 182–83, 104 S. Ct. at 1743 ("[T]he correct inquiry [of whether government action violates the Fourth Amendment] is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment."); *Greenwood*, 486 U.S. at 39, 108 S. Ct. at 1628 (citing *Oliver v. United States* and Justice Harlan's *Katz* concurrence for the proposition that a warrantless search and seizure of garbage left outside for collection would only violate the Fourth Amendment "if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable"); *Henderson*, 435 N.W.2d at 396 (noting the test to determine whether a government action intrudes upon a person's legitimate expectation of privacy is "whether the government's intrusion infringes upon the personal and societal values protected by the fourth amendment" (quoting *State v. Flynn*, 360 N.W.2d 762, 765 (Iowa 1985) (en banc))). Under this analysis, Wright must show he had a subjective expectation of privacy in the contents of the garbage he left out for collection and this expectation of privacy was reasonable. *See State v. Brooks*, 888 N.W.2d 406, 411 (Iowa 2016).

Our court has continued to use this analysis as part of our two-step approach to determine whether there has been a violation of article I, section 8 of the Iowa Constitution, which requires the defendant to demonstrate a legitimate expectation of privacy in the area searched before we can examine whether the search violated the defendant's rights. *See,*

*e.g.*, *id.* Wright now asks us to depart from those holdings and interpret article I, section 8 of the Iowa Constitution to require greater protection than the Fourth Amendment to the United States Constitution. Particularly, Wright maintains Iowans have an objectively reasonable expectation of privacy in their garbage set out for collection in a publicly accessible area.

In his motion to suppress, Wright relied on chapters 105 and 106 of the City of Clear Lake ordinances, which govern solid waste control and the collection of solid waste, to support his argument that Iowans have a reasonable expectation of privacy in the garbage they set out for collection in a publicly accessible area. Wright notes these ordinances prohibit anyone from scavenging who is not "an authorized solid waste collector," and establish that only solid waste collectors contracted with the city have authority to collect garbage from residential premises. *See* Clear Lake, Iowa, Code of Ordinances § 105.11(4); *id.* § 106.07. Accordingly, Wright maintains he, "like so many other Iowans across the state, has an objectively reasonable expectation of privacy codified by municipal code" by which he "can expect the privacy of his garbage will be maintained up to the point where the licensed collector physically takes possession of his garbage bags." I disagree.

While city ordinances may codify societal expectations of privacy in some circumstances, the definitive purpose of the ordinances Wright relies on has nothing to do with privacy. Rather, as Clear Lake, Iowa, Code of Ordinances section 105.01 proclaims,

> The purpose of the chapters in this Code of Ordinances pertaining to Solid Waste Control and Collection is to provide for the sanitary storage, collection and disposal of solid waste and, thereby, to protect the citizens of the City from such hazards to their health, safety and welfare as may result from the uncontrolled disposal of solid waste.

Thus, I have no doubt that the intent of this ordinance was to establish a waste management and sanitation system to promote public health and cleanliness. The majority expands this purpose by judicial fiat in order to establish an expectation of privacy where there is none in ordinance chapters focused on public hygiene. We should not "read something into the law that is not apparent from the words chosen by the" city council. *State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017) (quoting *State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007)).

Moreover, Wright's notion that Iowans have a reasonable expectation of privacy in garbage that was left out for collection simply because a city ordinance prohibits scavenging or establishes waste collection procedures "is totally unrealistic, unreasonable, and in complete disregard of the mechanics of its disposal." *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir. 1978), *cert denied*, 439 U.S. 841, 99 S. Ct. 132 (1978) (affirming the constitutionality of a warrantless search of defendant's trash that he placed in the garbage for collection under the Fourth Amendment). The removal of garbage by a waste collection provider who could immediately turn the garbage over to the police is no different than removal of the garbage by the police themselves. Either way, Wright's privacy expectation was the same when he placed his garbage out for collection because he expressly did so to convey it to a third party who could just as easily have sorted through it "or permitted others, such as the police, to do so" without any input from Wright. *Greenwood*, 486 U.S. at 40, 108 S. Ct. at 1629. Nothing in the record suggests Clear Lake's contracted waste collection providers or sanitation department had any responsibility to protect the privacy of Wright's garbage, let alone "to help him dispose of the evidence of his crimes." *Shelby*, 573 F.2d at 973.

"[S]ociety's experience with trash left at the alley or curb for collection" demonstrates there is no objective expectation of privacy in the contents of that trash. *State v. A Blue in Color, 1993 Chevrolet Pickup*, 116 P.3d 800, 804–05 (Mont. 2005). Organizations like Iowa Legal Aid warn individuals that "[d]umpster diving" is a method of identity theft and encourage Iowans to "[s]hred financial documents and paperwork with personal information before you put them in the trash" as a way to protect against identity theft. Iowa Legal Aid, *Identity Theft* (Mar. 30, 2011), https://www.iowalegalaid.org/resource/identity-theft-2 [https://perma.cc/7HDD-HJX7]. As the Delaware Superior Court stated in holding no warrant was required to search garbage,

> The media is replete with warnings to people not to put personal items in their trash such as bills, receipts, mailers from credit card companies, etc., which can be converted to forged credit cards, etc. Some of the media coverage and much advertising is not only to warn people not to do so but to instead shred such documents. This regrettable phenomenon over the last few years clearly emphasizes that reasonable people must or should have a lessened expectation of privacy in their trash. To put it differently, the expectation of privacy is no longer reasonable in this situation.

*State v. Ranken*, 25 A.3d 845, 860 (Del. Super. Ct. 2010), *aff'd sub nom. Ranken v. State*, No. 718, 2010, 2011 WL 2089603, at *1 (Del. May 24, 2011) ("[T]he final judgment of the Superior Court should be affirmed on the basis of and for the reasons assigned by the Superior Court . . . .").

The conclusion that the city's ordinances regulating waste management do not create an objectively reasonable expectation of privacy is supported by a plethora of other states that have similarly examined the impact of city ordinances regulating waste management on the privacy interests of garbage set out for collection.[10] For instance, the

---

[10]*See, e.g., Rikard v. State*, 123 S.W.3d 114, 120–21 (Ark. 2003) (rejecting appellants' claim that city ordinances regulating waste management and prohibiting

Massachusetts Supreme Judicial Court rejected a defendant's claim that an "ordinance allow[ing] only licensed trash collectors to transport garbage" established a reasonable expectation of privacy in garbage. *Commonwealth v. Pratt*, 555 N.E.2d 559, 567 (Mass. 1990). It reasoned that "licensed collectors may have rummaged through the defendant's garbage themselves" and "once the defendant knew that the garbage would be picked up by licensed collectors and deposited at the local landfill, he should have known that others could gain access to the garbage." *Id.*

The Arkansas Supreme Court rejected a defendant's claim that city ordinances prohibiting scavenging and disturbing the contents of containers established a reasonable expectation of privacy in garbage. *Rikard v. State*, 123 S.W.3d 114, 121 (Ark. 2003). It explained,

> Without question, the Jonesboro city ordinances were not created to provide citizens with an expectation of privacy in their garbage. Rather, the intent of the ordinance undoubtedly

scavenging gave them a reasonable expectation of privacy in their garbage under the Arkansas Constitution); *State v. DeFusco*, 620 A.2d 746, 752 n.17 (Conn. 1993) (rejecting defendant's argument that an ordinance prohibiting scavenging created a reasonable expectation of privacy in garbage left at the curb for collection); *State v. Schultz*, 388 So. 2d 1326, 1327 (Fla. Dist. Ct. App. 1980) (holding a defendant did not have a reasonable expectation of privacy in garbage that he left in the area in front of his home for collection in accordance with the city ordinances governing garbage collection); *Commonwealth v. Pratt*, 555 N.E.2d 559, 567 (Mass. 1990) (rejecting defendant's claim that ordinances regulating waste management establish a reasonable expectation of privacy); *State v. McMurray*, 860 N.W.2d 686, 693–94 (Minn. 2015) (criticizing the dissent's argument that county ordinances regulating waste management require greater search and seizure protections for garbage under the Minnesota Constitution than the United States Constitution); *State v. Brown*, 484 N.E.2d 215, 218 (Ohio Ct. App. 1984) (per curiam) (noting a municipal ordinance regulating waste collection did not establish a reasonable expectation of privacy in garbage because the purpose of the ordinance was to promote efficient garbage removal); *Commonwealth v. Minton*, 432 A.2d 212, 216–17 (Pa. Super. Ct. 1981) (holding a township code prohibiting people other than the occupant from removing garbage container covers did not provide the garbage container owner with a reasonable expectation of privacy because the purpose of the code was for sanitation, not privacy); *State v. Stevens*, 734 N.W.2d 344, 347–48 (S.D. 2007) (explaining city ordinances regulating waste management "do not manifest [societal expectations of privacy] simply because they dictate how persons are to place their trash for collection or how the trash is to be collected," especially because the city ordinances the defendant cited were enacted for sanitation purposes).

was to provide a city-wide system for waste management and sanitation services, with an emphasis on cleanliness and preventing any scattering of that garbage.

*Id.* The United States Supreme Court rejected a comparable argument in *Greenwood* "that [Greenwood's] expectation of privacy in his garbage should be deemed reasonable as a matter of federal constitutional law because the warrantless search and seizure of his garbage was impermissible as a matter of California law." 486 U.S. at 43, 108 S. Ct. at 1630.

In addition to the lack of an objectively reasonable expectation of privacy in this case, there is scant evidence that Wright even knew of the ordinances regulating scavenging or garbage collection to support his argument that he maintained a subjective expectation of privacy. Even if Wright was aware of the ordinances he cites, he still discarded his garbage "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it." *Id.* at 40–41, 108 S. Ct. at 1629 (quoting *Reicherter*, 647 F.2d at 399). He did not even place lids on his garbage cans.

If Wright wanted to ensure the contents of his garbage were private as not to be seen by anyone, then his decision to place them at the edge of the public alley without so much as a lid to cover them is illogical. Even if no other humans went through Wright's garbage, he was still exposing it to the possibility that it would be visible to anyone—including law enforcement—by placing it there. For example, a gust of wind could knock Wright's garbage cans over, exposing his garbage bags "to the predations of dogs and raccoons" and the possibility of his garbage being "found strewn across streets and alleyways." *A Blue in Color, 1993 Chevrolet Pickup,* 116 P.3d at 804–05. "[I]t is inconceivable that [he] intended to

retain a privacy interest in the discarded objects." *Reicherter*, 647 F.2d at 399.

In *Abel v. United States*, the Supreme Court held a defendant "abandoned" personal property items when he threw them away in the hotel room garbage can and vacated the room, thereby giving the hotel the "exclusive right to its possession" and to permit law enforcement to search the wastebasket without a warrant. 362 U.S. 217, 241, 80 S. Ct. 683, 698 (1960). When questioned about the relevance of the abandonment theory to this case at oral argument, Wright maintained the Supreme Court in *Greenwood*—which it decided after *Abel*—rejected the argument that the respondent was not entitled to an expectation of privacy because he abandoned his property and any corresponding privacy interests in it when he discarded it and placed it curbside for collection. Fundamentally, the Supreme Court "never expressly, nor impliedly for that matter, rejected the abandonment theory" in *Greenwood*, and "[t]ry as one might, no one is able to point to a single passage in the *Greenwood* majority opinion that suggests otherwise." *United States v. Redmon*, 138 F.3d 1109, 1119 (7th Cir. 1998) (Coffey, J., concurring). Justice Brennan's dissent in *Greenwood* proclaimed the majority "reject[ed] the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned." *Greenwood*, 486 U.S. at 51, 108 S. Ct. at 1634 (Brennan, J., dissenting). Yet, Justice Brennan also criticized the majority for "rel[ying] heavily" on lower court cases—the majority of which "rely entirely or almost entirely on an abandonment theory"—as support for its holding that there is no reasonable expectation of privacy in discarded garbage. *Id.* at 49 n.2, 108 S. Ct. at 1633 n.2.

Although the Supreme Court did not explicitly mention "abandonment" in *Greenwood*, its analysis was couched in abandonment

language. It emphasized that there could be no reasonable expectation of privacy in "*discarded*" items a person places in garbage left "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, *for the express purpose of having strangers take it.*" *Id.* at 40–41, 108 S. Ct. at 1629 (majority opinion) (emphasis added) (second quoting *Reicherter*, 647 F.2d at 399). In doing so, it quoted and cited various state and federal cases that relied on the abandonment doctrine to determine the Fourth Amendment did not protect garbage left for collection in a publicly accessible area. *Id.* at 40–42, 108 S. Ct. at 1629–30 (citing cases). Therefore, Wright's abandonment of the garbage in this case is relevant to the analysis.

"Property is abandoned when the owner no longer wants to possess it." *Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc). Wright's decision to place his garbage bags in the garbage cans at the edge of the public alley "for hauling to a public dump signifies abandonment." *Shelby*, 573 F.2d at 973. Though he apparently "decided to assume the risk, calculating no one would think to search in his garbage can[s], or he may have been careless, . . . he evidenced an intent in a convenient but risky way to permanently disassociate himself from the incriminating contents." *Id.*

By placing his garbage bags at the edge of the public alley for disposal, Wright was essentially "proclaiming to all the world that 'I'm through with this stuff; come and get it.'" *Commonwealth v. Ousley*, 393 S.W.3d 15, 34–35 (Ky. 2013) (Cunningham, J., concurring in result). Wright did not even care to put the lids on his garbage cans, let alone try to use any more secure method—like a padlock or "private property" sign, for example—to keep people out of his garbage. Ultimately, a person's discarded garbage does not change constitutional dimensions based on

who is searching through it.  When Wright discarded his garbage, he abandoned his interest in it, along with any Fourth Amendment or article I, section 8 protections in the process.  *See, e.g., United States v. Thomas,* 864 F.2d 843, 845 (D.C. Cir. 1989) ("When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." (quoting *United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir. 1983))); *Reicherter,* 647 F.2d at 399 ("[T]he placing of trash in garbage cans at a time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment." (alteration in original) (quoting *Shelby,* 573 F.2d at 973)); *United States v. Vahalik,* 606 F.2d 99, 101 (5th Cir. 1979) (per curiam) ("[T]he act of placing garbage for collection is an act of abandonment which terminates any [F]ourth [A]mendment protection . . . .").

The city's ordinance prohibiting scavenging recognizes this concept of garbage as abandoned property.  In Iowa, an individual cannot be convicted of theft for taking abandoned objects because theft requires "[t]ak[ing] possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof." Iowa Code § 714.1(1) (2017).  Wright relinquished any interest in the contents of his garbage when he discarded it at the edge of the public alley for waste collection.  There can be no intent to deprive Wright of objects he already abandoned, and "[a]bandoned property belongs to the finder of the property against all others, including the former owner." *Benjamin,* 534 N.W.2d at 406.

The majority's conclusion that the city's antiscavenging ordinance establishes the city's intent to protect the property and corresponding privacy interests of its residents renders the antiscavenging ordinance redundant and unnecessary.  The Iowa Code already criminalizes property

through its theft statute as at least a simple misdemeanor offense depending upon the monetary value of the property. *See* Iowa Code § 714.2(5) (classifying the lowest degree of theft as a simple misdemeanor). At the time of Officer Heinz's garbage pull, simple misdemeanor theft offenders were subject to fines as high as $625 and "imprisonment not to exceed thirty days" for simple misdemeanor theft. Iowa Code § 903.1(1)(*a*).

Because a person who takes the property of another is already subject to criminal prosecution for theft, there would be no need for an additional ordinance prohibiting scavenging if the city were simply trying to protect a property interest in garbage. As I noted earlier, this is also clear from the city's purpose statement governing the antiscavenging ordinance, which asserts the purpose of the ordinance is "to protect the citizens of the City from such hazards to their health, safety and welfare as may result from the uncontrolled disposal of solid waste." Clear Lake, Iowa, Code of Ordinances § 105.01. An ordinance enacted to promote public hygiene does not establish an objectively reasonable expectation of privacy in garbage.

Overall, I would conclude the existence of city ordinances in Iowa regulating waste management does not require us to provide greater protections under article I, section 8 of the Iowa Constitution against the warrantless search of garbage set out for collection in a publicly accessible area. Thus, I would review Wright's privacy expectations in accordance with *Greenwood*. Wright abandoned the garbage at issue at the edge of a public alley outside his home anticipating the waste collector would take it, but any member of the public—including the police—could have accessed his garbage. As the Supreme Court held in *Greenwood*, a person does not have an objectively reasonable expectation of privacy in garbage left for collection in a publicly accessible area. This holding is supported

by the overwhelming majority of state courts that have examined this issue under the United States Constitution or their respective state constitutions.[11]   For these reasons, I believe the district court correctly

---

[11]*See, e.g., State v. Fassler*, 503 P.2d 807, 813–14 (Ariz. 1972) (en banc) (holding law enforcement's search of the garbage can located in an alleyway at the premises where defendant was arrested did not violate the Fourth Amendment because the defendant surrendered his privacy in the garbage's contents by placing them in the publicly accessible garbage can); *Rikard*, 123 S.W.3d at 120–21 (rejecting appellants' claim that city ordinances regulating waste management and prohibiting scavenging gave them a reasonable expectation of privacy in their garbage under the Arkansas Constitution); *People v. Hillman*, 834 P.2d 1271, 1277–78 (Colo. 1992) (en banc) (upholding law enforcement's search of defendant's garbage because defendant "did not have a reasonable expectation of privacy in his garbage when he placed his garbage adjacent to the sidewalk, rendering it readily accessible to the public"); *DeFusco*, 620 A.2d at 752 n.17 (rejecting defendant's argument that an ordinance prohibiting scavenging created a reasonable expectation of privacy in garbage left at the curb for collection); *Ranken*, 25 A.3d at 859–60 (holding the Delaware Constitution's search and seizure provision did not protect a trash container left curbside on a public sidewalk because the defendant's expectation of privacy in the trash was not objectively reasonable); *Schultz*, 388 So. 2d at 1327 (holding a defendant did not have a reasonable expectation of privacy in garbage that he left in the area in front of his home for collection in accordance with the city ordinances governing garbage collection); *Scott v. State*, 606 S.E.2d 312, 315 (Ga. Ct. App. 2004) (upholding law enforcement's search of defendant's garbage left out for collection because the defendant abandoned the contents of the garbage by placing them out for collection and thus had no reasonable expectation of privacy in them); *State v. Donato*, 20 P.3d 5, 10 (Idaho 2001) (holding the Idaho Constitution does not provide greater protection to privacy rights in garbage than the United States Constitution and no objectively reasonable expectation of privacy exists in garbage left out for collection because it "is knowingly exposed to public view"); *People v. Stage*, 785 N.E.2d 550, 552 (Ill. App. Ct. 2003) (affirming "[t]he long-standing precedent in Illinois . . . that an individual has no reasonable expectation of privacy protection in his garbage"); *State v. Alexander*, 981 P.2d 761, 766–67 (Kan. Ct. App. 1999) (holding law enforcement's search of defendant's garbage was lawful because defendant had no reasonable expectation of privacy in garbage placed in a dumpster outside by the publicly accessible curb); *State v. Rando*, 848 So. 2d 19, 23 n.3 (La. Ct. App. 2003) (holding the search of defendant's garbage was reasonable based on the United States Supreme Court's holding in *Greenwood* that "persons have no reasonable expectation of privacy in garbage"); *State v. Sampson*, 765 A.2d 629, 636 (Md. 2001) (holding the Fourth Amendment does not protect "trash [that] is placed for collection at a place that is readily accessible, and thus exposed, to the public, [because] the person has relinquished any reasonable expectation of privacy" in that trash); *Pratt*, 555 N.E.2d at 567 (holding law enforcement's search of a trash bag in front of the defendant's residence did not violate the defendant's right against unreasonable searches and seizures under the Massachusetts Declaration of Rights because defendant did not have a reasonable expectation of privacy in the contents of his trash bag); *People v. Thivierge*, 435 N.W.2d 446, 447 (Mich. Ct. App. 1988) (per curiam) (declining to provide greater search and seizure protections for garbage under the Michigan Constitution than the United States Constitution because "the depositing of garbage on or at the side of a public street . . . negates any reasonable expectation of

privacy in inculpatory items secreted therein"); *McMurray*, 860 N.W.2d at 693–94 (criticizing the dissent's argument that county ordinances regulating waste management require greater search and seizure protections for garbage under the Minnesota Constitution than the United States Constitution); *State v. Trahan*, 428 N.W.2d 619, 623 (Neb. 1988) (holding that "[g]arbage left for collection at a designated location and accessible to the public shall not be accorded constitutional protection"); *People v. Crump*, 1 N.Y.S.3d 866, 867 (App. Div. 2015) (holding law enforcement's search of defendant's curbside garbage can did not violate the Fourth Amendment because "[t]he defendant had no reasonable expectation of privacy in the refuse he placed at the curb"); *State v. Hauser*, 464 S.E.2d 443, 447 (N.C. 1995) (upholding "a warrantless search of garbage by police, after pickup by the regular collector in the normal manner"); *State v. Schmalz*, 744 N.W.2d 734, 742 (N.D. 2008) (upholding law enforcement's warrantless search of defendant's garbage because defendant "lost his expectation of privacy when he placed the trash for collection, and therefore the garbage search falls outside the protections of Article 1, section 8 of the state constitution and the Fourth Amendment to the federal constitution"); *Brown*, 484 N.E.2d at 218 (noting a municipal ordinance regulating waste collection did not establish a reasonable expectation of privacy because the purpose of the ordinance was to promote efficient garbage removal); *Cooks v. State*, 699 P.2d 653, 656 (Okla. Crim. App. 1985) (upholding law enforcement's warrantless search of "curbside trash," "join[ing] those other jurisdictions holding curbside trash is abandoned property, over which appellant has no reasonable expectation of privacy"); *Minton*, 432 A.2d at 217 (holding a township code prohibiting people other than the occupant from removing garbage container covers did not provide the garbage container owner with a reasonable expectation of privacy because the purpose of the code was for sanitation, not privacy); *State v. Briggs*, 756 A.2d 731, 743 (R.I. 2000) (holding defendant had no objectively reasonable expectation of privacy in the contents of a trash bag after the defendant placed the bag into the bed of his pickup truck for it to be collected and placed in the communal dumpster of a multi-dwelling tenement); *Stevens*, 734 N.W.2d at 347–48 (explaining city ordinances regulating waste management "do not manifest [societal expectations of privacy] simply because they dictate how persons are to place their trash for collection or how the trash is to be collected," especially because the city ordinances the defendant cited were enacted for sanitation purposes); *Levario v. State*, 964 S.W.2d 290, 295–96 (Tex. App. 1997) (holding a warrantless search of defendant's "discarded trash" did not constitute an unlawful search and seizure because defendant "had no reasonable expectation of privacy in discarded trash"); *State v. Jackson*, 937 P.2d 545, 550 (Utah Ct. App. 1997) (holding that "the Utah Constitution does not prohibit the warrantless search" of garbage left streetside for collection); *Commonwealth v. Bryant*, Record No. 2715–04–1, 2005 WL 1017629, at *2 (Va. Ct. App. May 3, 2005) (holding the trial court erred in suppressing evidence obtained from a warrantless search of defendant's trash can because "discarded garbage placed on the side of the street for pickup does not fall within any recognized privacy interest protected by the Fourth Amendment"); *Barekman v. State*, 200 P.3d 802, 810 (Wyo. 2009) (holding law enforcement's warrantless search of a trash bag retrieved from trash cans in front of the defendant's home did not violate the defendant's search and seizure protections under the State or Federal Constitution because defendant lacked "an expectation of privacy in his trash that society would accept as objectively reasonable").

determined Wright did not have a reasonable expectation of privacy in his garbage for it to be protected under the Iowa or United States Constitution when it denied Wright's motion to suppress.

**B. The Impact of Recent Supreme Court Decisions.** The Supreme Court's decisions in *United States v. Jones* and *Florida v. Jardines* in 2012 and 2013 marked the revival of the physical trespass test as part of the Fourth Amendment analysis in addition to the *Katz* reasonable-expectation-of-privacy test. *See Jones*, 565 U.S. at 409, 132 S. Ct. at 952. Cumulatively, the physical trespass test formulated in those cases establishes that law enforcement conducts a "search" for Fourth Amendment purposes regardless of any privacy expectations if they physically trespass on a constitutional "effect" "for the purpose of obtaining information," *id.* at 404, 132 S. Ct. at 949, or they commit an unlicensed physical intrusion of one's curtilage, *Jardines*, 569 U.S. 1, 9–10, 133 S. Ct. 1409, 1416–17 (2013).

Wright's brief does not cite *Jardines* or discuss the physical trespass test as it was expanded in *Jardines*. However, he does comparably argue we need not analyze any privacy expectations under the *Katz* test because Officer Heinz violated Wright's state and federal search and seizure protections under *Jones* when he physically trespassed on Wright's personal effects—namely, his garbage—to obtain information. I will address this argument in-depth later, but the reemergence of the trespass test does not overrule *Greenwood* to render it no longer binding in our analysis of Wright's privacy expectations under the *Katz* test. Contrary to the majority's treatment of Wright's privacy expectations as though they are largely irrelevant, the Supreme Court asserted in *Jones* that "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted*

*for*, the common-law trespassory test." *Jones*, 565 U.S. at 409, 132 S. Ct. at 952.

*Jones* and *Jardines* provide an additional trespass analysis to the warrantless search of garbage, but the Supreme Court's 2018 opinion in *Carpenter* presents more relevant questions about the enduring validity of *Greenwood* and the *Katz* test. Specifically, *Carpenter* calls into question *Greenwood*'s analysis governing an individual's privacy expectations in garbage due to *Greenwood*'s use of the third-party doctrine, which provides "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," to conclude individuals lacked an objectively reasonable expectation of privacy in garbage placed in a publicly accessible area. *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2216 (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S. Ct. 2577, 2582 (1979)).

In *Carpenter*, the Supreme Court considered "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements" without a warrant. *Id.* at ___, 138 S. Ct. at 2211. In the past, the Supreme Court had applied the third-party doctrine to hold individuals have no legitimate expectation of privacy—and thus no Fourth Amendment protection—in their telephone numbers or bank records because they contained information exposed to third parties. *Smith*, 442 U.S. at 743–44, 99 S. Ct. at 2582; *United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 1624 (1976). Nonetheless, it declined to extend the reach of the third-party doctrine to cover the government's warrantless seizure of the cell phone location records at issue in *Carpenter* "given [their] unique nature." 585 U.S. at ___, 138 S. Ct. at 2217.

Instead, the Court recognized that "an individual maintains a legitimate expectation of privacy in the record of his physical movements

as captured through [cell phone location records]," so the acquisition of those records constituted a search under the Fourth Amendment for which "the Government must generally obtain a warrant supported by probable cause before acquiring." *Id.* at ___, ___, 138 S. Ct. at 2217, 2221. It explained, "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts" and "provides an intimate window into a person's life" because "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at ___, 138 S. Ct. at 2217–18. Additionally, the Court reasoned the exposure of cell phone location records was more compelled than voluntary because cell phones and their services are "indispensable to participation in modern society" and "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* at ___, 138 S. Ct. at 2220.

In dissent, multiple Justices noted the new limitations the majority's opinion imposed on the third-party doctrine. Justice Kennedy asserted, "[t]he Court's multifactor analysis—considering intimacy, comprehensiveness, expense, retrospectivity, and voluntariness—puts the [third-party doctrine] on a new and unstable foundation." *Id.* at ___, 138 S. Ct. at 2234 (Kennedy, J., dissenting). Justice Alito lamented, "[T]he Court effectively allows Carpenter to object to the 'search' of a third party's property, not recognizing the revolutionary nature of this change." *Id.* at ___, 138 S. Ct. at 2260 (Alito, J., dissenting). Meanwhile, Justice Gorsuch sought to go further than the majority in its limitations on the third-party doctrine in his dissent, arguing the third-party doctrine was altogether "horribly wrong." *Id.* at ___, 138 S. Ct. at 2262 (Gorsuch, J., dissenting)

(quoting Orin S. Kerr, *The Case for the Third-Party Doctrine*, 107 Mich. L. Rev. 561, 564 (2009)).

In discussing the troubles of the third-party doctrine under the *Katz* test, Justice Gorsuch criticized the Court's holding in *Greenwood* based on its reliance on the third-party doctrine in determining individuals do not have an objectively reasonable expectation of privacy in their garbage placed in a publicly accessible area for consumption. *Id.* at ___, 138 S. Ct. at 2266. Justice Gorsuch opined,

> In [*Greenwood*], the Court said that the homeowners forfeited their privacy interests because "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." But the habits of raccoons don't prove much about the habits of the country. I doubt, too, that most people spotting a neighbor rummaging through their garbage would think they lacked reasonable grounds to confront the rummager. Making the decision all the stranger, California state law expressly protected a homeowner's property rights in discarded trash. Yet rather than defer to that as evidence of the people's habits and reasonable expectations of privacy, the Court substituted its own curious judgment.

*Id.* at ___, 138 S. Ct. at 2266 (alteration in original) (emphasis omitted) (citations omitted) (quoting *Greenwood*, 486 U.S. at 40, 108 S. Ct. at 1628–29). Justice Thomas similarly cast doubt on the validity of the *Katz* test, arguing, "it invites courts to make judgments about policy, not law" and leads to circularity because the "Court is supposed to base its decisions on society's expectations of privacy, [but] society's expectations of privacy are, in turn, shaped by this Court's decisions." *Id.* at ___, ___, 138 S. Ct. at 2236, 2245 (Thomas, J., dissenting).

Based on the dissenting opinions in *Carpenter*, the majority has decided we should no longer follow *Greenwood*. Such reliance to anticipatorily overrule *Greenwood* is problematic for a number of reasons

beyond the fact that Wright never so much as cited *Carpenter* in his briefs. Even under the *Carpenter* rationale and its limitations on the third-party doctrine, Wright still does not have an objectively reasonable expectation of privacy in his garbage because garbage is not comparable to the cell phone location records conveyed to a third party in *Carpenter*. Through the cell-site records in *Carpenter*, the government was able to map the location of the petitioner's cell phone—and likely the petitioner himself—over the course of 127 days, allowing the government to "achieve[] near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2218 (majority opinion). The Court remarked this sophisticated level of surveillance deserved unique protections compared to past types of surveillance that have been upheld as constitutional under the third-party doctrine, such as the placing of a beeper in a container to augment visual surveillance in tracking a vehicle through traffic, *United States v. Knotts*, 460 U.S. 276, 103 S. Ct. 1081 (1983). *See Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2218.

In distinguishing between cell-site information and past surveillance techniques, the *Carpenter* Court reasoned past techniques used to reconstruct a person's movements, like the beeper in *Knotts*, "were limited by a dearth of records and the frailties of recollection." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2218. Searching through the contents of garbage placed in a publicly accessible area for waste collection is not analogous to tracking a cell phone for 127 days and certainly does not "achieve[] near perfect surveillance, as if [the government] had attached an ankle monitor to the phone's user." *Id.* at ___, 138 S. Ct. at 2218. Rather, it is simply "a dearth of records" that law enforcement must comb through and put together in combination with other investigative techniques to discern any useful information about a defendant's activities. *Id.* at ___, 138 S. Ct. at

2218. This is hardly the invasive, nonstop monitoring the Supreme Court sought to protect individuals against in *Carpenter*.

Further, unlike the "indispensable" nature of the cell phone, nobody forced Wright to use the city's waste collection service. He could have disposed of the garbage directly at the city's designated landfill or intermingled it with garbage disposed of in some other public receptacle if he was genuinely concerned about the anonymity of his garbage. *See* Iowa Code §§ 455B.361(2) (defining "litter" as "any garbage, rubbish, trash, refuse, waste materials, or debris not exceeding ten pounds in weight or fifteen cubic feet in volume"), .363 (authorizing the "discarding of such litter in or on areas or receptacles provided" for litter disposal). Wright also had the option of disposing of his garbage in a private waste receptacle owned by others with their permission or at a citizen convenience center. *Id.* § 455B.307A(2) (prohibiting the disposal of solid waste "into areas or receptacles provided for such purposes which are under the control of or used by a person who has not authorized the use of the receptacle by the person discarding the solid waste"); Clear Lake, Iowa, Code of Ordinances § 105.11(1) (requiring individuals to obtain the owner's written consent before "[d]eposit[ing] refuse in any [garbage cans]" they do not own); Iowa Admin. Code r. 567—106.2 (defining "citizen convenience center" as "a permanent, fixed-location facility that has the primary purpose of receiving solid waste from citizens and small businesses that do not utilize solid waste collection vehicles or satellite solid waste collection vehicles"). Wright's decision to dispose of his garbage by placing it at the edge of his public alley for the city's contracted waste collection service to collect is not compelled in the same way cell-site location records are to warrant the unique protection those records received in *Carpenter*.

Moreover, as discussed previously, the nature of garbage as abandoned property similarly cuts against finding any privacy interests in it. The Supreme Court's holding in *Greenwood* was not simply based on the third-party doctrine, as the Court also focused on the fact that the respondent had discarded his garbage, thereby abandoning any privacy expectation in its contents. 486 U.S. at 43–44, 108 S. Ct. at 1630–31. Therefore, the third-party doctrine discussed in recent Supreme Court decisions is but one factor in our analysis in this case.

The distinct nature of garbage discarded for collection as abandoned property distinguishes it from a letter entrusted to a postal carrier, for example. Unlike garbage, "[l]etters and other sealed packages [in transit] are in the general class of effects in which the public at large has a legitimate expectation of privacy," so "warrantless searches of such effects are presumptively unreasonable." *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 1657 (1984). Unlike garbage, there are all sorts of laws protecting the privacy of the mail owner. *See, e.g.*, 39 C.F.R. § 267.2 (2017); *id.* § 266.1. It is a federal offense to take "any letter, postal card, or package out of any" mailbox "before it has been delivered to the person to whom it was directed." 18 U.S.C. § 1702. The penalty for doing so is a fine, imprisonment for not more than five years, or both. *Id.*

> When one "relinquishes possession" of mail to the postal service, it is with the implicit understanding that it will be delivered safely and unopened to the addressee or, if delivery cannot be effected, returned unopened to the sender. We are unaware of any custom or practice wherein citizens expect that their trash be returned to them in the event that the trash collector finds the landfill closed. While we could write pages pointing out the defects in the mail-garbage analogy, . . . we decline to join those who see no significant difference between the garbage and the mail.

*People v. Stage*, 785 N.E.2d 550, 552 (Ill. App. Ct. 2003).

Finally, we should not attempt to read the tea leaves to adopt what we think may become a shift in Supreme Court jurisprudence based on changes in the composition of the Supreme Court, the *Carpenter* Court's test for cell phone location records, and various Justices' dissenting or concurring opinions to overrule binding Supreme Court precedent. As the Supreme Court has stressed,

> If a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22 (1989); *see also Agostini v. Felton*, 521 U.S. 203, 237–38, 117 S. Ct. 1997, 2017 (1997) (reaffirming its declaration that lower courts "should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions" (quoting *Rodriguez de Quijas*, 490 U.S. at 484, 109 S. Ct. at 1921–22)).

Until the Supreme Court itself overrules *Greenwood*, it remains good law. Interpreting our analogous state constitutional provision in the same manner as the Supreme Court provides the public with "increased confidence that the decision is 'rooted in law rather than in will.'" *Gaskins*, 866 N.W.2d at 53–54 (Waterman, J., dissenting) (quoting G. Alan Tarr, *Understanding State Constitutions* 176 (1998)). This is especially so when the constitutional provisions at issue are virtually identical and the only argument for departure is a party's subjective belief that there is a "compelling" reason for departure based on a city ordinance that has nothing to do with privacy, as is the case here. *See* Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. Balt. L. Rev. 379, 392 (1980) ("[T]o make an independent argument under the state clause

takes homework—in texts, in history, in alternative approaches to analysis. It is not enough to ask the state court to reject a Supreme Court opinion on the comparable federal clause merely because one prefers the opposite result.").

**C. The Trespass Element of Search and Seizure Law.** Wright also contends the district court erred in denying his motion to suppress regardless of any privacy expectations concerning his garbage. According to Wright, the Supreme Court's 2012 *Jones* decision stands for the proposition that any physical intrusion by the government on his personal effects—including his garbage—to obtain information is a trespass that amounts to a warrantless search in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Wright does not ask us to depart from Fourth Amendment precedent to reach a different conclusion under article I, section 8 should we determine Officer Heinz's actions did not infringe upon Wright's protections under the Fourth Amendment. Although we reserve the right to apply substantive federal standards more stringently, I only analyze Wright's trespass argument under the federal standard because he does not make a separate argument under the Iowa Constitution. *See Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019) ("The plaintiffs have not suggested that we should follow different substantive standards under the Iowa Constitution than would be applied to procedural due process claims under the Federal Constitution. As a result, we apply the substantive federal standards, reserving the right to apply these standards in a more stringent fashion than under federal caselaw.").

During the suppression hearing, Officer Heinz testified that he never left the public alley to retrieve Wright's garbage, but he briefly touched the garbage cans on two of the three occasions he obtained Wright's garbage

bags. Wright argues Officer Heinz physically trespassed by touching the garbage cans and "the opaque bags inside to remove them" to obtain information. Wright believes this alleged trespass upon his "effects" constituted a search in violation of the Fourth Amendment and article I, section 8 based on the Supreme Court's decision in *Jones*.

In *Jones*, a law enforcement task force installed a GPS tracking device on the undercarriage of a Jeep registered to the defendant's wife without a warrant and tracked the Jeep's movements over the course of twenty-eight days while investigating the defendant for narcotics trafficking. 565 U.S. at 402–03, 132 S. Ct. at 948. This tracking produced more than 2000 pages of data over the four-week surveillance period and helped lead to the defendant's conviction on various narcotics charges. *Id.* at 403–04, 132 S. Ct. at 948–49. The defendant moved to suppress the evidence collected through the GPS device, but the district court only granted the motion in part. *Id.* at 403, 132 S. Ct. at 948. It suppressed the data obtained while the defendant was parked at his residence, but it determined the remaining data was admissible because the defendant "ha[d] no reasonable expectation of privacy in his movements from one place to another" while "traveling in an automobile on public thoroughfares." *Id.*

The Supreme Court reversed the district court's decision, holding the warrantless installation of the GPS device on the defendant's vehicle and its use to track the vehicle's movements was a search in violation of the Fourth Amendment because "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.* at 404, 132 S. Ct. at 949. The Supreme Court stressed the significance of property rights within the meaning of the Fourth Amendment when it was adopted, explaining, "Fourth Amendment jurisprudence was tied to common-law

trespass, at least until the latter half of the 20th century." *Id.* at 405, 132 S. Ct. at 949. Although the Supreme Court acknowledged its later cases have applied Justice Harlan's reasonable-expectation-of-privacy test from his *Katz* concurrence, it concluded that test was unnecessary to apply under the circumstances. As the Supreme Court declared, "[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 409, 132 S. Ct. at 952. Because the Fourth Amendment's history "embod[ied] a particular concern for government trespass upon" effects like the defendant's Jeep, the Supreme Court held the trespass—the installation of the GPS tracking device to obtain information about the defendant—violated the Fourth Amendment regardless of any privacy expectations concerning the Jeep. *Id.* at 406, 410, 132 S. Ct. at 950, 952.

A year later, the Supreme Court expanded upon its use of the physical trespass test again in *Jardines*. There, the Court held the government conducted a search for Fourth Amendment purposes when law enforcement walked onto a homeowner's porch with a drug-sniffing dog to investigate the contents of the home. *Jardines*, 569 U.S. at 9–10, 133 S. Ct. at 1416–17. In reaching its decision, the Court recognized the porch as curtilage—a constitutionally protected area—and remarked, "the only question is whether [the homeowner] had given his leave (even implicitly) for [law enforcement] to" enter the curtilage. *Id.* at 8, 133 S. Ct. at 1415. The Court concluded law enforcement's use of the drug-sniffing dog to explore the area around the home was a search under the Fourth Amendment because the conduct was an unlicensed physical intrusion. *Id.* at 9, 133 S. Ct. at 1416. It distinguished between a visitor routinely knocking on the door, for which there is a limited, implied license for a specific purpose based on social norms, and the more invasive purpose of

using a drug-sniffing dog to explore details about the home. *Id.* at 8–10, 133 S. Ct. at 1415–17.

Together, *Jones* and *Jardines* establish a physical trespass test in which law enforcement conducts a search for Fourth Amendment purposes if they physically trespass on a constitutional "effect" to "obtain[] information," *Jones*, 565 U.S. at 404, 132 S. Ct. at 949, or they commit an unlicensed physical intrusion of a constitutionally protected area, *Jardines*, 569 U.S. at 9–10, 133 S. Ct. at 1416–17. This use of the trespass test under the Fourth Amendment marked a significant change in the Supreme Court's Fourth Amendment jurisprudence, as it had not employed any formal trespass test between 1886 and its decision in *Jones* in 2012. Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 76–77 (2012) [hereinafter Kerr].[12] Though the Supreme Court had equated searches with trespasses informally until the 1960s, it had "abandoned the trespass test in favor of" the reasonable-expectation-of-privacy test until the Supreme Court revived the trespass test in *Jones. Id.* at 67–68. Wright relies on the resurgence of the trespass test in asking us to find Officer Heinz violated his Fourth Amendment and article I, section 8 rights by touching Wright's garbage cans and bags to obtain information without a warrant.

Whether Officer Heinz violated Wright's constitutional search and seizure rights by physically touching Wright's garbage cans and bags at the edge of the public alley to obtain information depends on whether these

---

[12]*See also* Laurent Sacharoff, *Constitutional Trespass*, 81 Tenn. L. Rev. 877, 886 (2014) ("When we restrict our view [of the Fourth Amendment] to Supreme Court cases, an almost comical history of uncertainty with respect to trespass emerges. Roughly speaking, the Court rejected any trespass requirement in 1886 in *Boyd v. United States*, applied a trespass test in 1928 in *Olmstead v. United States,* and rejected the 'trespass doctrine' in *Katz v. United States*, before finally adopting a trespass test in *United States v. Jones*—only to then avoid it, possibly, in *Florida v. Jardines.*" (footnotes omitted)).

items are "effects" under federal and state constitutional law. Most courts, including those that have held constitutional protections exist in garbage, have only examined law enforcement's warrantless grab of another's garbage to obtain information under the reasonable-expectation-of-privacy test without examining whether law enforcement trespassed upon a constitutionally protected "effect" in the form of garbage containers or their contents. *See Greenwood*, 486 U.S. at 41–43, 108 S. Ct. at 1629–30 (compiling federal and state appellate court decisions holding individuals do not have a reasonable expectation of privacy in garbage left for collection in a publicly accessible area); *see also State v. Tanaka*, 701 P.2d 1274, 1276–77 (Haw. 1985); *State v. Goss*, 834 A.2d 316, 319 (N.H. 2003); *State v. Hempele*, 576 A.2d 793, 804–07 (N.J. 1990). *Jones* never defined what constitutes an "effect" and "[c]ourts reviewing warrantless garbage pulls post-*Jones* have largely remained silent on the question of whether garbage itself counts as a personal effect." Tanner M. Russo, Note, *Garbage Pulls Under the Physical Trespass Test*, 105 Va. L. Rev. 1217, 1235 (2019); *see also* Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 Yale L.J. 946, 957–60 (2016) [hereinafter Brady] (explaining the failure of Jones to define "effect").

Because the Supreme Court in *Jones* relied upon the common law of trespass to determine whether a search occurred, I look to the common law doctrine of trespass to chattels to determine whether Wright's garbage placed at the edge of the public alley for collection constitutes an "effect." *Cf. Jones*, 565 U.S. at 411, 132 S. Ct. at 953 (holding the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted"); *see also id.* at 418–19, 132 S. Ct. at 957–58 (Alito, J., concurring in the judgment) ("By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers

in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.  And for this reason, the Court concludes, the installation and use of the GPS device constituted a search." (footnotes omitted)).[13]  "Since at least the late eighteenth century, chattel property has generally been marked by three features: (1) the ability to exclude others, (2) the ability to transfer the object, and (3) control over its use."  Brady, 125 Yale L.J. at 1002; *see also* 2 William Blackstone, *Commentaries* *388–89 (defining possessed chattel property as maintaining the "right, and also the occupation, of any movable chattels; so that they cannot be transferred from him, or cease to be his, without his own act or default").  Here, the garbage bags and their contents failed to exhibit these features by virtue of their location on the edge of the public alley for anyone to access and Wright's intention to convey them to a third-party collector.

The law of abandonment further supports this conclusion.  "Property is abandoned when the owner no longer wants to possess it."  *Benjamin*, 534 N.W.2d at 406.  This occurs through "proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property."  *Id.*  In upholding law enforcement's warrantless search of a garbage can in a hotel room, the Supreme Court previously recognized the contents of the garbage can were "abandoned" personal property after the defendant threw them away and vacated the room.  *Abel*, 362 U.S. at 241, 80 S. Ct. at 698.  As explained above, Wright's decision to

---

[13]"Trespass has taken many forms and changed over time, rendering it a tricky doctrine to pin down."  Kerr, 2012 Sup. Ct. Rev. at 90.  The Supreme Court never defined which of the various eighteenth-century understandings of trespass are incorporated into a Fourth Amendment search in *Jones.*  Nevertheless, the interactions between Justice Scalia in the majority opinion and Justice Alito in his concurrence suggest that the Supreme Court was referring to a trespass to chattels in *Jones.*  *Id.* ("Justice Alito suggests in his concurrence that the majority is referring to a trespass to chattels.  The majority did not contradict Alito's claim; given Scalia's many volleys with Alito in *Jones,* this may suggest tacit agreement." (footnote omitted)).

place the garbage at the edge of the public alley "for hauling to a public dump signifies abandonment." *Shelby*, 573 F.2d at 973.

"We are unaware of any custom or practice wherein citizens expect that their trash be returned to them . . . ." *Stage*, 785 N.E.2d at 552. Additionally, unless Wright was going to sit outside next to the garbage cans and monitor them to ensure nobody went through their contents, he had no real ability to exclude others or control where it was transferred. Consequently, he could not demonstrate an ability to exclude others or the ability to transfer the object—two of the three touchstones of chattel property.

He also no longer maintained control over the garbage's use—the third touchstone of chattel property. If he genuinely wanted to retain control over the garbage at issue, he would not have placed it in a publicly accessible area where any person, animal, or even the weather could expose their contents to the public or transport them to another location. Accordingly, the garbage bags and their contents do not meet the common law understanding of what constitutes chattel in order to be considered an effect protected under the Fourth Amendment or article I, section 8.

Although Wright may have been under the mistaken belief that only the waste collector would take the garbage, and thus, anyone else who took it was unlicensed to do so, this still does not render Officer Heinz's conduct a search under the Supreme Court's holding in *Jardines*. *Jardines* is limited to police conduct that occurs when law enforcement officers physically invade curtilage, "the area 'immediately surrounding and associated with the home'" such that it is "part of the home itself for Fourth Amendment purposes." 569 U.S. at 6, 133 S. Ct. at 1414 (quoting *Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742). Wright never argued the garbage was located on curtilage. "[W]e will not speculate on the arguments [the parties]

might have made and then search for legal authority and comb the record for facts to support such arguments." *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996). In any event, the district court found "no evidence that Officer Heinz ever left the public alley to collect any of the garbage." We give the district court's factual findings deference due to the district court's ability to assess the witnesses' credibility. *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017). A public alley is not "part of the home itself for Fourth Amendment purposes." *Jardines*, 569 U.S. at 6, 133 S. Ct. at 1414 (quoting *Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742).

Finally, even if Wright's garbage cans were constitutionally protected effects, Officer Heinz's brief touching of the cans to retrieve Wright's abandoned garbage was not a trespass in violation of the Fourth Amendment. "Not all trespasses by law enforcement are violations of the Fourth Amendment." *United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016) (holding law enforcement did not trespass upon defendant's property for constitutional purposes by seizing evidence in the basement common area of the multi-unit apartment complex where defendant lived, explaining that a trespass only violates the Fourth Amendment if it occurs on a constitutionally protected area). Despite its reliance on a trespass test in *Jones* and *Jardines*, the Supreme Court has not identified "which version of trespass the Fourth Amendment search doctrine incorporates." Kerr, 2012 Sup. Ct. Rev. at 90.

Justice Scalia's *Jones* opinion reasoned the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted," *Jones*, 565 U.S. at 411, 132 S. Ct. at 953, suggesting "the scope of Fourth Amendment protection remains fixed [at the eighteenth-century standard] despite intervening changes in trespass law," Kerr, 2012 Sup. Ct. Rev. at 923. Yet, "the existence of a property interest is determined by

reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164, 118 S. Ct. 1925, 1930 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)). Hence, "[c]hanges in trespass law could be recognized as changing the scope of protections without truly changing the Fourth Amendment." Kerr, 2012 Sup. Ct. Rev. at 93. Given the changes to common law trespass over time, it is appropriate for us to follow the trespass laws of today rather than of the eighteenth century.

Today, the common law doctrine of trespass to chattel requires "some actual damage to the chattel before the action can be maintained." *Jones*, 565 U.S. at 419 n.2, 132 S. Ct. at 957 n.2 (Alito, J., concurring in judgment) (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on Law of Torts* 87 (5th ed. 1984) [hereinafter *Prosser & Keeton*]). Where the alleged trespasser "merely interferes without doing any harm—as where, for example, he merely lays hands upon the plaintiff's horse, or sits in the car" there is no action for trespass "in the absence of any actual damage." *Prosser & Keeton* at 87; *see also* Restatement (Second) of Torts § 218, at 420 (Am. L. Inst. 1981) (explaining one is only liable for a trespass to chattel if that person "dispossesses the other of the chattel"; "the chattel is impaired as to its condition, quality, or value"; "the possessor is deprived of the use of the chattel for a substantial time"; or "bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest"). Similarly, Iowa law generally only criminalizes a "trespass" if some form of damage accompanies the trespass. *See* Iowa Code § 716.7(2).

Here, Officer Heinz merely touched Wright's garbage cans without causing any actual damage to them. Therefore, even if Wright's garbage

cans were constitutionally protected effects, Officer Heinz did not commit a trespass in violation of the Fourth Amendment or article I, section 8 by briefly touching them. I believe Officer Heinz acted lawfully when he obtained Wright's garbage from the edge of the public alley and accordingly would affirm the district court's orders denying Wright's motion to suppress.

**D. Problems with the Majority's Approach.** By attempting to resolve what it characterizes as "competing, inconsistent doctrines governing seizure and search law," the majority injects more uncertainty into our search and seizure jurisprudence. The majority hides its most significant holding in this case by waiting until the last portion of its opinion to declare, "Within the meaning of article I, section 8, an officer acts unreasonably when, without a warrant, the officer physically trespasses on protected property or uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited." It follows that rule with a citation to a law review article and the following quote from that article in parentheses that enlightens the majority's reader to the far-reaching impact of its holding:

> [A] court should ask whether government officials have engaged in an investigative act that would be unlawful for a similarly situated private actor to perform. That is, stripped of official authority, has the government actor done something that would be tortious, criminal, or otherwise a violation of some legal duty? Fourth Amendment protection, in other words, is warranted when government officials either violate generally applicable law or avail themselves of a governmental exemption from it.

William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment,* 129 Harv. L. Rev. 1821, 1825–26 (2016).

The majority's broad conclusion that an officer's conduct is "unreasonable" and thus in violation of article I, section 8, "when, without

a warrant, the officer physically trespasses on protected property or uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited" flies in the face of the United States Supreme Court and calls into question the constitutionality of many of our laws currently allowing law enforcement officers to take certain actions during investigations that private citizens cannot take. Unlike private citizens, law enforcement officers have increased arrest authority,[14] may enter private property to make an arrest under certain conditions,[15] issue citations in lieu of arrest,[16] arrest a material witness without a warrant,[17] participate in a crime for the purpose of gathering evidence under some conditions,[18] execute a *Terry* stop,[19] use roadblocks for vehicle stops under proper circumstances,[20] and perform certain seizures under the community caretaking doctrine,[21] to name a few of the ways law enforcement authority exceeds that of private citizens. Or at least it did until today.

Under the majority's reasoning, it appears numerous valid law enforcement methods are no longer allowed without a warrant because these actions are prohibited if performed by a private citizen. "Our

---

[14]Iowa Code section 804.7 lists six situations in which a peace officer may make an arrest without a warrant while Iowa Code section 804.9, which governs arrests by private persons, only lists two situations in which a private person may make an arrest.

[15]*See* Iowa Code § 804.15.

[16]*See* Iowa Code § 805.1(1).

[17]*See* Iowa Code § 804.11(1).

[18]*See* Iowa Code § 704.11(1).

[19]*See State v. Tyler*, 830 N.W.2d 288, 292–93 (Iowa 2013) (discussing the validity of investigatory or *Terry* stops in the traffic stop context).

[20]*See State v. Hilleshiem*, 291 N.W.2d 314, 318 (Iowa 1980) (en banc) (explaining when law enforcement may use roadblocks to stop vehicles for investigatory purposes).

[21]*See State v. Werner*, 919 N.W.2d 375, 379 (Iowa 2018) (explaining the community caretaking doctrine).

decisions have universally held that the purpose of a *Terry* stop is to investigate crime," concluding such warrantless stops—including traffic stops—were justified if law enforcement had reasonable suspicion to investigate a crime. *State v. Tyler,* 830 N.W.2d 288, 293 (Iowa 2013). A private citizen who conducts a warrantless traffic stop that temporarily hinders the motorist's ability to leave for the purposes of investigating a crime subjects himself to criminal and civil liability for various offenses. *See, e.g., Nelson v. Winnebago Indus., Inc.,* 619 N.W.2d 385, 388 (Iowa 2000) (en banc) ("We have defined false imprisonment as an unlawful restraint on freedom of movement or personal liberty. The elements of the tort are (1) detention or restraint against a person's will, and (2) unlawfulness of the detention or restraint." (citation omitted)). Because the majority concludes an officer's conduct is "unreasonable" and thus in violation of article I, section 8, "when, without a warrant, the officer physically trespasses on protected property or uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited," investigative *Terry* stops may now be unconstitutional because a private citizen cannot lawfully use the same means of criminal investigation.

Likewise, the exigent circumstances exception to the warrant requirement is no more under the majority's rationale. In the past, we have upheld warrantless searches if they were "based on probable cause and exigent circumstances." *State v. Naujoks,* 637 N.W.2d 101, 107 (Iowa 2001). If "a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched" and exigent circumstances existed, officers had the authority to conduct a warrantless search. *Id.* at 108–09. These circumstances included situations that involved "danger of violence and

injury to the officers; risk of the subject's escape; or the probability that, unless immediately seized, evidence will be concealed or destroyed." *Id.* at 108. However, a private citizen is technically subject to various criminal offenses for entering another person's private property without consent to conduct a warrantless search regardless of these exigent circumstances, so the exigent circumstances exception to the warrant requirement now appears to have a shaky foundation under the majority's holding today.

The community caretaking exception to the warrant requirement, too, would no longer be a reliable law enforcement tool under the majority's holding. Under this exception, we previously upheld law enforcement's warrantless seizures if law enforcement was engaged in "bona fide community caretaker activity" that the officer subjectively intended to engage in and the "public need and interest outweigh[ed] the intrusion upon the privacy of the citizen." *State v. Coffman*, 914 N.W.2d 240, 245 (Iowa 2018) (quoting *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003)). We have previously discussed the United States Supreme Court case of *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973), to explain the purpose of the community caretaking function. There, officers entered an automobile to remove the defendant's unattended firearm from the vehicle before it was towed away in what the Supreme Court considered a constitutional warrantless search because it was justified under the community caretaking exception. *Id.* at 437, 447–48, 93 S. Ct. at 2526, 2531. According to the majority's expansive definition of unreasonable conduct, this sort of action to protect the public may no longer be constitutional because it involves a physical intrusion on personal property.

"Westlaw will be busy tracking down and flagging the decisions of our court that, after today, are no longer good law." *Schmidt v. State*, 909 N.W.2d 778, 819 (Iowa 2018) (Mansfield, J., dissenting).

> Clarity as to what the law requires is generally a good thing. It is especially beneficial when the law governs interactions between the police and citizens. Law enforcement officials have to make many quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other.

*Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 601 (Iowa 2011). Unfortunately, our state law enforcement officials are now left with a guess-and-see approach to many actions previously considered lawful, undermining public safety in the process.

### III. Conclusion.

For these reasons, I would affirm the district court's denial of Wright's motion to suppress and its judgment of conviction.

Waterman and Mansfield, JJ., join this dissent.

**WATERMAN, Justice (dissenting).**

I respectfully dissent and join the separate dissents of Chief Justice Christensen and Justice Mansfield. I too would affirm the decisions of the district court and court of appeals denying the defendant's motion to suppress. I write separately to emphasize several points.

First, the majority's new de facto test—if a private citizen can't search discarded trash, the police can't do it either—has never been recognized by any court or dissent in the country.[22] That is not surprising. The test makes little sense. Police officers can do many things private citizens cannot. For example, I can't set up a roadblock for vehicle equipment checks. I can't run red lights to respond to a 911 call for help. I can't detain someone I suspect of a crime (*Terry* stop). I can't offer a complicit neighbor a cooperation agreement to inform on the drug dealer next door. I can't search a fellow passenger's luggage boarding a plane or

---

[22]The majority opinion begins with a quote from a dissent "that government officials shall be subjected to the same rules of conduct that are commands to the citizen." The majority's introductory paragraph describes that limitation on the police as a "bedrock constitutional principle." The majority nevertheless purports to retreat from its broad test by stating in footnote five in division III(E) that it is holding something else: "[A]rticle I, section 8 prohibits an officer engaged in general criminal investigation from conducting a search or seizure that constitutes a trespass on a person's house, papers, or effects without first obtaining a warrant." That brief retreat to a narrower holding is reversed in division IV(D), when the majority again touts its broader test, favorably quoting a law review article proposing that a "court should ask whether government officials have engaged in an investigative act that would be unlawful for a similarly situated private actor to perform." So forgive my skepticism that the new test is the narrower one stated in footnote five.

In any event, I disagree with the premise of the majority's "holding" that trash placed curbside for disposal is an effect entitled to constitutional protection. The majority cites no court holding that discarded garbage is an effect entitled to Fourth Amendment protection. Today's majority decision stands alone among trash rip cases in equating "garbage bags" with "expensive luggage" for purposes of determining the "container[']s" constitutional protection. And the majority joins a jurisprudential fringe in concluding a defendant "did not abandon all right, title, and interest" in garbage placed curbside for collection.

a fellow fan's backpack entering Kinnick Stadium. Police officers can do those things and many others without a court-issued warrant. Until today, they could search discarded trash for evidence of crimes, hardly an infringement on anyone's civil liberties.

I would not adopt a new constitutional test that has not been vetted by the adversary process and adjudicated first by the district court. The majority denies the State the opportunity to make a record in district court on all the problems with its new approach. By the majority author's own standards, Wright waived any reliance on this new test by never asking the court to adopt it. *State v. Gibbs*, 941 N.W.2d 888, 905 (Iowa 2020) (McDonald, J., concurring specially in the judgment, joined by Oxley, J.).

The majority is guilty of faux originalism, "living" constitutionalism, and ahistorical analysis. The majority finds no support for its newly concocted test in the Federalist Papers or the debates at the Iowa constitutional convention. Those sources are neither confronted nor consulted to test its false premise that law enforcement historically could not search garbage. Again, I am not surprised. "I have no doubt that examining people's waste has been an investigative tool of law enforcement throughout recorded history." *State v. Morris*, 680 A.2d 90, 104 (Vt. 1996) (Dooley, J., dissenting). That longstanding practice continues to this day, as shown in Chief Justice Christensen's dissent, in its second footnote. The majority cites no historical evidence to the contrary. The reality is that citizens have scavenged through discarded waste for centuries. Mary Downs & Martin Medina, *A Short History of Scavenging*, 42 Compar. Civilizations Rev. 23, 23 (2000) ("The recovery of materials from waste to be reused or recycled has been carried out for millennia, and probably throughout the whole of human history."). "Scavenging flourished during the nineteenth century," and in the United States, peddlers freely searched

trash in alleyways and town dumps for items of value. *Id.* at 34–35. Applying the logical converse of the majority's test: "if a private citizen can do it, so can the police," then discarded trash was fair game for perusal by laypeople and law enforcement alike when our federal and state constitutions were written.

The historical record belies any claim that at the time of our nation's founding, police could not conduct warrantless searches outside homes to investigate crime. On the contrary, constables, customs officials, and other law enforcement officers enjoyed statutory authority to seize and search private property outside the home. *See* Gerard V. Bradley, *Present at the Creation? A Critical Guide to* Weeks v. United States *and Its Progeny*, 30 St. Louis U. L.J. 1031, 1041–45 & nn.64–65 (1986) ("Warrantless searches, then as now, were the rule rather than the exception, and each of the thirteen colonies, and then states, as a common statutory practice, authorized them. The First Congress, which passed the fourth amendment, also authorized warrantless searches." (footnote omitted)). Indeed, private citizens could search and seize illicit goods as well. "At common law, any person may at his peril, seize for a forfeiture to the government; and if the government adopt his seizure, and the property is condemned, he will be completely justified . . . ." *Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246, 310 (1818).[23] Our framers focused on protecting private *homes* from searches pursuant to general warrants, not discarded trash.

---

[23] *See also* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 767 (1994) ("At common law, it seems that nothing succeeded like success. Even if a constable had no warrant, and only weak or subjective grounds for believing someone to be a felon or some item to be contraband or stolen goods, the constable could seize the suspected person or thing. The constable acted at his peril. If wrong, he could be held liable in a damage action. But if he merely played a hunch and proved right—if the suspect *was* a felon, or the goods *were* stolen or contraband—this ex post success apparently was a complete defense."). Again, discarded trash was fair game for searches by police and private citizens alike when our Federal Constitution was enacted.

*See* David E. Steinberg, *Restoring the Fourth Amendment: The Original Understanding Revisited*, 33 Hastings Const. L.Q. 47, 62 (2005) ("From the beginning, the doctrine of unreasonable searches and seizures focused on house searches, and not other types of government conduct."). It is specious to claim police could not search discarded trash outside the home's curtilage at our nation's founding and then project that nonexistent limitation on Officer Heinz in Clear Lake today.

The majority's historical analysis involves sleight of hand by equating lack of authority to enter private *homes* without a warrant in 1789 or 1857 to lack of authority to search discarded trash outside the home's curtilage. That is a leap too far today and at our nation's founding. The majority correctly recognizes that the Iowa search and seizure provision "as originally understood, was meant to provide the same protections as the Fourth Amendment, as originally understood." Put another way, our state constitution's framers did not require *greater* restrictions on law enforcement.

Chest-thumping about our independent power to interpret the Iowa Constitution is not persuasive. Our court should not rely on our independent constitutional authority simply to evade federal precedent we don't like.[24] We should explain why a different result is supported by

---

[24]The majority cites *State v. Ochoa*, 792 N.W.2d 260 (Iowa 2010), seven times and *State v. Short*, 851 N.W.2d 474 (Iowa 2014), three times, quoting liberally from those decisions. Their common denominator with today's decision is that the court freelanced under the Iowa Constitution to evade settled federal precedent and create a new standard the defendant never raised or argued and is contrary to the position of most state courts. *See State v. Baldon*, 829 N.W.2d 785, 835–47 (Iowa 2013) (Mansfield, J., dissenting) (cataloging flaws in *Ochoa*); *see also Short*, 851 N.W.2d at 507–19 (Waterman, J., dissenting); *id.* at 519–27 (Mansfield, J., dissenting); *id.* at 527–45 (Zager, J., dissenting). Today's majority also quotes liberally from *State v. Ingram*, 914 N.W.2d 794 (Iowa 2018), another 4–3 decision of breathtaking overbreadth that unnecessarily handicaps law enforcement in vehicle inventory searches. *See id.* at 824–25 (Mansfield, J., concurring specially). I would not rely on the shifting sands of this court's mistakes departing from the national consensus in search and seizure precedents.

differences in the text, history, or purpose of the Iowa provision, persuasive decisions from our sister states, or practical problems. *See State v. Gaskins*, 866 N.W.2d 1, 50–56 (Iowa 2015) (Waterman, J., dissenting) (urging use of neutral interpretive principles or divergence criteria). Such analysis is missing in the majority and concurring opinions, and thereby "vindicate[s] the worst fears of the critics of judicial activism." *State v. Hempele*, 576 A.2d 793, 816 (N.J. 1990) (O'Hern, J., concurring in part and dissenting in part). Consistency with federal precedent interpreting identical language promotes legitimacy:

> We have declared that "[d]ivergent interpretations are unsatisfactory from the public perspective, particularly where the historical roots and purposes of the federal and state provisions are the same." A citizen becomes confused when he or she finds that under virtually identical constitutional provisions, it is permissible for a federal agent, but not a [state] law-enforcement officer, to search his or her garbage. . . . In my view, garbage does not change its constitutional dimensions based on who searches the garbage in a particular location. Different treatment of such an ordinary commodity appears illogical to the public and hence breeds a fundamental distrust of the legal system that develops such distinctions.

*Id.* at 817 (Garibaldi, J., dissenting) (first alteration in original) (citation omitted) (quoting *State v. Hunt*, 450 A.2d 952, 955 (N.J. 1982)). Applying its own divergence criteria, the Minnesota Supreme Court recently declined to depart from federal precedent in holding police could conduct warrantless searches of garbage under its state constitution. *State v. McMurray*, 860 N.W.2d 686, 690–95 (Minn. 2015). We should reach the same conclusion.

As set forth in Chief Justice Christensen's dissent, federal authorities nationwide and police in the overwhelming majority of states can lawfully conduct warrantless searches of garbage placed out for collection. That is because most courts view trash as abandoned property

devoid of any reasonable expectation of privacy, as Justice Mansfield further explains in his dissent. The majority relies on no court in any jurisdiction that has held garbage discarded for pickup is an "effect" within the meaning of the Fourth Amendment or equivalent state constitutional search and seizure provision. Trash rips are an important investigatory tool for law enforcement; they gather evidence leading to search warrants that shut down meth labs and other societal scourges. We will now see more federal drug prosecutions in Iowa because today's decision effectively ends the use of trash rips in state criminal prosecutions. Offenders facing federal time without parole likely won't view today's decision as advancing their civil liberties.

The scope and import of today's decision is at best unclear, at worst tumultuous. Perhaps it only applies to trash pulls in localities with an ordinance like Clear Lake's, and local elected officials can simply amend the ordinance to restore police powers to search garbage for evidence of crimes. Because people in most places can dumpster dive and remove items without being arrested for trespass or theft, life may go on unchanged in much of the state. Perhaps the new test is dicta that does not bind our trial courts in other contexts. But we won't have to wait long for defense counsel to argue *Terry* stops are now unconstitutional because a private citizen cannot detain someone acting suspiciously. Or that our decision reaffirming the automobile exception to the warrant requirement, *State v. Storm*, 898 N.W.2d 140, 156 (Iowa 2017), is no longer good law because a private citizen cannot conduct a traffic stop. The majority asserts that "[c]urrent Fourth Amendment jurisprudence is a mess" to

justify a new test that simply exacerbates uncertainty. Their decision raises more questions than it answers and creates a far bigger mess.[25]

I would follow *California v. Greenwood*, 486 U.S. 35, 40–41, 108 S. Ct. 1625, 1628–29 (1988), and our state's published appellate decisions holding that police do not need a warrant to search garbage placed out for collection. *See State v. Skola*, 634 N.W.2d 687, 689–91 (Iowa Ct. App. 2001) (applying the *Greenwood* analysis under both the United States and Iowa Constitutions to uphold a police search of the defendant's garbage); *State v. Henderson*, 435 N.W.2d 394, 396–97 (Iowa Ct. App. 1988) (same). Today's majority has not identified any problems that justify departing from this well-settled precedent. *See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.").

> "Courts adhere to the holdings of past rulings to imbue the law with continuity and predictability and help maintain the stability essential to society." "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step."

*State v. Iowa Dist. Ct.*, 902 N.W.2d 811, 817 (Iowa 2017) (citation omitted) (first quoting *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014); then quoting *McElroy v. State*, 703

---

[25]The majority self-servingly overstates the alleged incoherence of federal search and seizure precedent. *See Davis v. United States*, 564 U.S. 229, 247, 131 S. Ct. 2419, 2433 (2011) ("Decisions overruling this Court's Fourth Amendment precedents are rare."). By contrast, the special concurrence finds coherence in trends in Fourth Amendment precedent, but doesn't like the outcomes and would simply rely on the Iowa Constitution to get to his desired result.

Presumably, we will soon see a wave of postconviction-relief (PCR) actions seeking to overturn convictions in cases where a trash rip led to inculpatory evidence and a larger wave of PCRs alleging defense counsel provided constitutionally-deficient representation for failing to anticipate our court would adopt the new test limiting police investigations to what private citizens can do.

N.W.2d 385, 394 (Iowa 2005)). Finding no compelling reason to overrule precedent, I would stay the course.

The majority identifies only six states that do not follow *Greenwood* under their state constitutions. *People v. Edwards*, 458 P.2d 713, 718 (Cal. 1969) (en banc) (pre-*Greenwood* decision holding defendant had a justified expectation of privacy in garbage can next to his house); *State v. Goss*, 834 A.2d 316, 319 (N.H. 2003) (rejecting *Greenwood* under New Hampshire Constitution, construing state constitution to provide greater protection than the Fourth Amendment); *Hempele*, 576 A.2d at 814 (majority opinion) (rejecting *Greenwood* under New Jersey Constitution); *State v. Crane*, 254 P.3d 117, 123 (N.M. Ct. App. 2011) (holding defendant had reasonable expectation of privacy in garbage under New Mexico Constitution), *aff'd on other grounds*, 329 P.3d 689, 698–99 (N.M. 2014); *Morris*, 680 A.2d at 96 (majority opinion) ("The Vermont Constitution does not require the residents of this state to employ extraordinary or unlawful means to keep government authorities from examining discarded private effects."); *State v. Boland*, 800 P.2d 1112, 1116–17 (Wash. 1990) (en banc) (rejecting *Greenwood* under privacy clause of Washington Constitution, with four justices dissenting). None of these decisions relied on the rationale adopted today—if a private citizen can't do it, neither can a police officer. I don't find those cases persuasive.

The New Hampshire, Vermont, and Washington decisions expressly relied on unique privacy clauses or other textual provisions not found in the Iowa or Federal Constitutions. *Goss*, 834 A.2d at 318–19; *Morris*, 680 A.2d at 93, 96; *Boland*, 800 P.2d at 1115–16. For that reason, in *Storm* we declined to follow decisions from those states rejecting the automobile exception. 898 N.W.2d at 153. The California case preceded *Greenwood* and is factually distinguishable because "the trash can was within a few

feet of the back door of defendants' home and required trespass for its inspection." *Edwards*, 458 P.2d at 718. By contrast, Officer Heinz never walked across Wright's yard to look in a trash container not yet placed out for collection. His feet remained planted on the public alleyway.

The dissents in these trash cases are more persuasive. As Justice Guy, who dissented in *Boland*, stated:

> [O]ne who discards his trash and places it at curbside to be picked up assumes the risk that the garbage collector may be an agent of the police or may permit the police to examine the unconglomerated trash once it is picked up.

800 P.2d at 1123 (Guy, J., dissenting). Even if under the majority's trespass theory an officer can't reach over the property line into a garbage can, "[p]olice merely have to wait until the trash is carried a few feet further than the curb and is emptied into the collection bin of the garbage truck before engaging in a warrantless search." *Id.* "Collectors do not bear some kind of fiduciary relationship with trash customers to make sure that their trash remains inviolate." *Goss*, 834 A.2d at 321 (Broderick, J., dissenting) (quoting *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir. 1978)). Justice Broderick noted:

> In my opinion and in the overwhelming opinion of other jurisdictions, as well as the United States Supreme Court, a defendant's subjective expectation of privacy in the contents of his trash left for pickup adjacent to a public way is not objectively reasonable.

*Id.* at 320. People know this, which is why they shred sensitive documents and cut up credit cards before disposal. When "virtually every other court that has considered the issue" finds no reasonable expectation of privacy in discarded trash, one cannot conclude "general social norms" support a privacy interest in that trash. *Hempele*, 576 A.2d at 818 (Garibaldi, J., dissenting).

The Wyoming Supreme Court unanimously considered and refused to join these states that found greater protection for trash under their constitutions and instead held the Wyoming Constitution did not require a warrant to search trash. *Barekman v. State*, 200 P.3d 802, 809–10 (Wyo. 2009) ("[O]nce Mr. Barekman placed his trash in the barrel at the curb . . . he evidenced the intent to relinquish any expectation of privacy he had in the contents."). We should reach the same conclusion as the Wyoming Supreme Court.

For these reasons and those set forth in my colleagues' dissents, I am unable to join the majority decision.

Christensen, C.J., and Mansfield, J., join this dissent.

**MANSFIELD, Justice (dissenting).**

Caliban: "Let it alone, thou fool; it is but trash." William Shakespeare, *The Tempest* act 4, sc. 1 [hereinafter *The Tempest*].

Caliban is right, it is but trash. To me, this case begins and ends with the syllogism that trash is trash. It is nobody's property; it has been voluntarily abandoned. Nicholas Wright put his two garbage cans out for collection next to a public alley without lids on them. If a private citizen had pulled something out of those cans, Wright would have no cause of action against that citizen. Yet somehow Officer Heinz violated his rights? I respectfully dissent and would affirm the denial of the motion to suppress.

To get to the odd result that trash set out for collection is constitutionally protected, the majority purports to follow traditional search and seizure principles. But the majority isn't restoring article I, section 8 to its original understanding. Instead, it bobs and weaves through five divisions, with reasoning as ephemeral as a spirit summoned by Ariel.

In reality, the majority doesn't adhere to traditional search and seizure principles, which focus on *property rights and reasonable expectations of privacy*. Rather, the majority fashions a brand new rule of search and seizure: If a private citizen can't do it, the police can't do it either.

It's true that the reasonable-expectations-of-privacy branch of Fourth Amendment jurisprudence has become more controversial in recent years. Several members of the United States Supreme Court have sought to pull back from reasonable expectations of privacy and restore a more consistent emphasis on property rights. *See, e.g., Carpenter v.*

*United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2238–44 (2018) (Thomas, J., dissenting); *id.* at ___, 138 S. Ct. at 2264–68 (Gorsuch, J., dissenting). But no respected jurist, to my knowledge, has heretofore said that the fundamental rule is: "If a private citizen can't do it, law enforcement can't do it as well."

The majority's approach disregards the plain text of article I, section 8. That section protects "[t]he right of the people to be secure in *their* persons, houses, papers and effects." Iowa Const. art. I, § 8 (emphasis added). Something that you've voluntarily thrown away is no longer *your* effect.

The majority's approach also completely fails to deal with standing. Obviously, private citizens cannot enter other people's motel rooms without permission. But when a sheriff's deputy did so, we upheld the warrantless entry because the defendant had not actually rented the room. *See State v. Brooks*, 760 N.W.2d 197, 206 (Iowa 2009). We said, "A defendant challenging a search and seizure occurring in the motel room of a third person must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Id.* at 205. Because the defendant lacked standing to challenge the search, his motion to suppress was properly denied. *Id.* But under the majority's newly hatched rule, the search would be no good, because cops cannot do what private citizens cannot do.

This case could be viewed through the lens of standing. Once Wright put his trash out for collection along the public alley, he lost *standing* to complain about what happened to it. *See State v. Bumpus*, 459 N.W.2d 619, 625 (Iowa 1990) ("Once an individual voluntarily abandons property he or she no longer has standing to challenge any search or seizure that may be made.").

In short, far from being faithful to Blackstone, Coke, Story, or any other venerable source, the majority's standard is its own home brew. All to protect trash! Instead of the majority's standard, I would follow existing United States Supreme Court and Iowa precedent. I would also apply traditional property law, which makes clear that Wright no longer had a legally protected interest in his trash when he put the open garbage cans out for pickup.

**I. There Is No Constitutionally Protected Interest in Trash Set Out for Collection; This Case Should Be Decided Based on Traditional Property Law.**

*California v. Greenwood* of course resolves any claim that the search of Wright's trash violated his Fourth Amendment rights. *See* 486 U.S. 35, 37, 108 S. Ct. 1625, 1627 (1988). At the request of the police, the regular trash collector picked up Greenwood's trash only and turned it over to the police. *Id.* This allowed the police to obtain evidence of narcotics use and grounds for a search warrant. *Id.* at 38, 108 S. Ct. at 1627. The Supreme Court sustained the constitutionality of the trash pull, reasoning that Greenwood had no reasonable expectation of privacy in his trash placed on the street for collection. *Id.* at 40–41, 108 S. Ct. at 1628–29.

Without incident or objection, *Greenwood* has been followed under the Iowa Constitution for the last thirty-three years. *See also State v. Skola*, 634 N.W.2d 687, 690–91 (Iowa Ct. App. 2001) (applying the *Greenwood* analysis under both the United States and Iowa Constitutions to uphold a police search of the defendant's garbage); *State v. Henderson*, 435 N.W.2d 394, 396–97 (Iowa Ct. App. 1988) (same).

Admittedly, *Greenwood* has come under criticism for its reliance on reasonable expectations of privacy. *See Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2266 (Gorsuch, J., dissenting). I agree that reasonable

expectations can be a squishy concept. But reverting to traditional principles of property law leads to the same result. Trash that you've abandoned is no longer your property. When you turn it over to the trash collector, this isn't a bailment, it's an abandonment.

The Fourth Amendment and article I, section 8 don't prohibit examining other people's lives. They protect people against unreasonable searches and seizures of "their persons, houses, papers, and effects." Garbage that has been abandoned at a publicly accessible spot is none of those things. It has ceased to be anything in which the discarder has any legal interest.

Let's go back to an earlier Supreme Court case that preceded *Greenwood*. In *Abel v. United States*, the Supreme Court relied on abandoned property principles to uphold the retrieval of trash from a wastebasket after the defendant had vacated a hotel room:

> Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were bona vacantia. There can be nothing unlawful in the Government's appropriation of such abandoned property.

362 U.S. 217, 241, 80 S. Ct. 683, 698 (1960). To the extent we find the reasoning of *Greenwood* unsatisfactory for article I, section 8 purposes, *Abel* works just fine.

Shifting the focus to Wright's real property or his garbage cans doesn't change the outcome in this case. Officer Heinz didn't set foot on Wright's land. The record shows that he reached into the garbage cans from the public alley. Nor did he commit trespass to chattel by unintentionally and briefly brushing against Wright's garbage cans.

Because the trash had been abandoned and Officer Heinz did not commit a trespass on Wright's real or personal property, there was no violation of the Fourth Amendment or article I, section 8. There is no need here to resort to Prospero's books and magic; we can and should decide this case simply on the basis of traditional property law. For all these reasons, I would affirm.

I will now return to discuss the majority opinion in more detail. Simply stated, the law "doth suffer a sea-change" in the majority opinion. *The Tempest*, act 1, sc. 2.

**II. The Majority's Discussion of Traditional Property Law Is Mistaken.**

Invoking traditional property law, the majority claims that Wright had not abandoned his trash. Therefore, according to the majority, Officer Heinz physically trespassed on it.

This discussion needs to be read carefully because it has no actual support in traditional property law. The entire basis for the majority's claim of nonabandonment and physical trespass is the City of Clear Lake antiscavenging ordinance. That ordinance makes it unlawful for anyone other than an authorized solid waste collector from "[t]ak[ing] or collect[ing] any solid waste which has been placed out for collection on any premises." Clear Lake, Iowa, Code of Ordinances § 105.11(4) (2003). In the majority's view, that ordinance gave Wright an ongoing property right in his trash even after he left it out for collection. I disagree.

The ordinance making it unlawful to rummage through other people's garbage cans is intended to prevent some of the adverse side effects of rummaging, such as items being removed from garbage cans and ending up as litter on the ground. It is not intended to confer some kind of higher privacy status on garbage that it would not otherwise have. We

know this because the stated purpose of this chapter is "to protect the citizens of the City from such hazards to their health, safety and welfare as may result from the uncontrolled disposal of solid waste." *Id.* § 105.01.

It is also important to review the Clear Lake ordinance as a whole. It reads,

Prohibited Practices.

It is unlawful for any person to:

1. Unlawful Use of Containers. Deposit refuse in any solid waste containers not owned by such person without the written consent of the owner of such containers.

2. Interfere with Collectors. Interfere in any manner with solid waste collection equipment or with solid waste collectors in the lawful performance of their duties as such, whether such equipment or collectors be those of the City, or those of any other authorized waste collection service.

3. Incinerators. Burn rubbish or garbage except in incinerators designed for high temperature operation, in which solid, semisolid, liquid or gaseous combustible refuse is ignited and burned efficiently, and from which the solid residues contain little or no combustible material, as acceptable to the Environmental Protection Commission.

4. Scavenging. Take or collect any solid waste which has been placed out for collection on any premises, unless such person is an authorized solid waste collector.

5. Burn Barrels. Burn solid waste in any burn barrel or other type of container.

6. Landscape Waste. Burn any landscape waste/yard waste.

*Id.* § 105.11.

Ordinance 105.11(4) is thus part of a list of "Prohibited Practices." The entire list is aimed at activities that interfere with the orderly collection of trash and lead to unsanitary conditions. Public health is the concern, not private property. Hence, the Clear Lake ordinance doesn't alter the reality that trash is trash.

Under the common law, abandonment involves an act of abandonment plus intent, both of which were present here. *See Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400, 406 (Iowa 1995) (en banc) ("Property is abandoned when the owner no longer wants to possess it. Abandonment is shown by proof that the owner intends to abandon the property and has voluntarily relinquished all right, title and interest in the property." (citation omitted)); *Abandonment, Black's Law Dictionary* (11th ed. 2019) (defining "abandonment" as "[t]he relinquishing of a right or interest with the intention of never reclaiming it"). An antiscavenging ordinance is simply irrelevant to this inquiry.

If the majority's analysis were right, then *Abel* was wrongly decided. That sixty-one-year-old Supreme Court precedent, not discussed or even cited by the majority, held that a defendant who threw away items in a hotel room wastebasket had no basis to complain when they were retrieved by a federal agent. *See Abel*, 362 U.S. at 241, 80 S. Ct. at 698. Of course, private persons other than hotel employees could not have lawfully accessed the wastebasket in *Abel*, just as here private persons other than solid waste collectors could not have lawfully removed items from the trash cans. But that did not affect the fact that the defendant had *abandoned* his trash.

### III. The Majority's "Bedrock Constitutional Principle" Cannot Withstand Scrutiny.

So we come to the real basis for the majority's decision—its supposed "bedrock constitutional principle" that the police under search and seizure law can do nothing that a private citizen cannot do. Again, the majority relies on the Clear Lake ordinance prohibiting anyone other than an authorized solid waste collector from "[t]ak[ing] or collect[ing] any solid waste which has been placed out for collection on any premises."

Clear Lake, Iowa, Code of Ordinances § 105.11(4). Ergo, the majority insists, this means Officer Heinz violated Wright's article I, section 8 rights when he took something out of his garbage cans.

There is kind of a glib attractiveness to this position. But it's wrong. Does the majority believe that in performing their investigative duties, the Clear Lake police cannot enter a city park between 11 p.m. and 5 a.m.? *See id.* § 47.05(1) (prohibiting private citizens from doing this). That they can't park their patrol car in any spot where private citizens are not allowed to park? *See id.* § 69.06 (same). That they can't park for more than two hours? *See id.* § 69.13 (same). That they can't drive on a barricaded street? *See id.* § 135.05 (same). Clearly, law enforcement can do things that private citizens cannot do.

If the majority's theory held water, a fleeing suspect who threw away contraband could successfully file a motion to suppress if law enforcement picked up the contraband from a spot that private citizens are technically not permitted to enter. After all, that is essentially the majority's theory in this case.

### IV. The Majority's Selective Quotations and Long Historical Discursions Do Not Support Its Asserted Bedrock Constitutional Principle.

The majority's quotations to support its "cops can't do what private citizens can't do" rule are taken out of context. Consider the majority's treatment of *Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409 (2013). The majority portrays the case as an illustration of its "cops can't do what private citizens can't do" rule of law. But the case was actually decided based on traditional property rights. Law enforcement brought a drug-sniffing dog onto the porch of the defendant's home to conduct an extensive—and successful—sniff. *Id.* at 4, 133 S. Ct. at 1413.

The Supreme Court resolved the case based on property principles, which made the case "straightforward." *Id.* at 5, 133 S. Ct. at 1414. The Court explained,

> The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id.* at 5–6, 133 S. Ct. at 1414. Later in the opinion, the Court discussed what "any private citizen might do" when entering the defendant's property, not because that was the underlying principle but because it illustrated the scope of the common law property right that anchored the Court's decision. *Id.* at 8, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 1862 (2011)).

The majority's quick take on *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596 (2021), also oversimplifies its meaning. In that case, as the majority notes, the Court again acknowledged that "officers may generally take actions that 'any private citizen might do' without fear of liability." *Id.* at ___, 141 S. Ct. at 1599 (quoting *Jardines*, 569 U.S. at 8, 133 S. Ct. at 1416). But the converse isn't true. That isn't *all* officers may do. Indeed, the *Caniglia* Court presented this as an *additional* warrant exception, not the only one. *See id.* at ___, 141 S. Ct. at 1599.

The majority also provides some musty legal history. These include a dissertation on the early Iowa caselaw on search and seizure. I am uncertain what purpose this narrative serves. None of the cases involve trash, none of the cases are difficult, and we would not decide the legality of the searches any differently under current search and seizure law. Today, as in 1859, a sheriff cannot seize someone's property by pretending

to have a writ of attachment he does not have. *See Pomroy & Co. v. Parmlee*, 9 Iowa 140, 147 (1859). Today, as in 1904, a sheriff needs a warrant to search a home. *See McClurg v. Brenton*, 123 Iowa 368, 371–72, 98 N.W. 881, 882 (1904). These cases do not prove the majority's claim of a bedrock constitutional principle.

## V. Recasting the Asserted Bedrock Constitutional Principle as a Rule of "Trespass" Does Not Advance the Majority's Analysis.

In footnote 5, the majority tries to recast its bedrock constitutional principle as one of trespass law. According to the majority, Officer Heinz committed a trespass. Yet footnote 5 freely concedes that Officer Heinz would not have committed a trespass at common law. Instead, the majority maintains that the Clear Lake ordinance redefined trespass.

This is an intriguing argument, but if I were Officer Heinz I would not be concerned that the majority "did bass my trespass." *The Tempest*, act 3, sc. 3.

For one thing, under traditional search and seizure principles, what matters is whether the defendant had a property right as to which the defendant committed a common law trespass. *United States v. Jones*, 565 U.S. 400, 405, 132 S. Ct. 945, 949 (2012) ("[O]ur Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century.") (Scalia, J.). Clear Lake did not purport to redefine property rights or common law trespass, nor would Clear Lake have had the power to do so. *See* Iowa Code § 364.1 (2017). As I have explained, the antiscavenging ordinance didn't give Wright a legal entitlement to that which he had already abandoned, nor would it have given him a legal right to sue anyone. Footnote 5 adds nothing to the majority opinion, except to make its central holding more elusive. There

is a critical difference, glossed over by the majority, between a municipal health and safety ordinance and traditional state property law.

**VI. Near the End of Its Opinion, the Majority Abandons Its Bedrock Constitutional Principle and Resorts to Its Own Mistaken Reasonable Expectations Analysis.**

One possible saving grace with the majority's decision is that municipalities can avoid its effects *simply by changing their ordinances*. Repeal the ordinance forbidding private citizens from "scavenging" trash, and trash pulls by law enforcement will become lawful once again.

Or maybe not. About seven-eighths of the way through its opinion, the majority backtracks. That is when the majority tells us, "Of course, this is not to say article I, section 8 rises and falls based on a particular municipal law." So much, I guess, for bedrock constitutional principle. At this point, the majority embraces the "reasonable expectation of privacy" perspective it had previously disparaged.

However, the majority doesn't opt for the settled Iowa law on reasonable expectations of privacy and trash pulls, as set forth in two published decisions of our court of appeals. Instead, it adopts the views expressed en passant by Justice Gorsuch in his *Carpenter* dissent. Notably, in a paragraph of that dissent, Justice Gorsuch offers a brief critique of *Greenwood*. *See Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2266.

The majority's reliance on Justice Gorsuch is unpersuasive to me. First, I think Justice Gorsuch's assessment of social norms is wrong. *See id.* at ___, 138 S. Ct. at 2266 ("I doubt, too, that most people spotting a neighbor rummaging through their garbage would think they lacked reasonable grounds to confront the rummager."). In many neighborhoods, people would not think twice about someone removing something from a garbage can after it has been set out for collection. The person violating

the social norm would be the person confronting the scavenger, not the scavenger.

Second, it's odd for the majority to invoke Justice Gorsuch on reasonable expectations because he was actually arguing against such an approach. His main point was that reasonable expectations had "yielded an often unpredictable—and sometimes unbelievable—jurisprudence." *Id.* at ___, 138 S. Ct. at 2266.

Here lies my one point of agreement with the majority. In analyzing article I, section 8, it might be better if we focused more on traditional property law than on reasonable expectations of privacy (although both sources support the lawfulness of the trash pull in this case). That being said, the majority's "rough magic," *The Tempest*, act 5, sc. 1, bears no resemblance to traditional property law.

Trash is as old as Shakespeare's time, and we should not be making up new search and seizure law to deal with it.

And if we are going to be devising new law, we should at least be direct, open, and consistent about it—all areas where the majority falls well short. From page to page, the majority opinion shifts ground. One moment, according to the majority, the antiscavenging ordinance is dispositive. Then, it isn't. At first this is a case about police being unable to do what private citizens can't do. Then it's a case about traditional property law. Then it's a case about reasonable expectations. According to the majority, the Iowa Constitution has a fixed, original meaning. Until it doesn't.

The majority opinion "seeks to hide itself." *The Tempest*, act 3, sc. 1. I respectfully predict it will have a short life as a precedent.

### VII.  The Special Concurrence Does Not Add to the Force of the Majority's Arguments, and in Some Ways Undermines Them.

The special concurrence says almost nothing about the issue actually before this court.  Instead of providing pertinent legal analysis on trash removals, the special concurrence retells a story about search and seizure that its author has already told in prior opinions.  *See, e.g., State v. Brown*, 930 N.W.2d 840, 873–99 (Iowa 2019) (Appel, J., dissenting); *State v. Short*, 851 N.W.2d 474, 481–93 (Iowa 2014).

The special concurrence wants to make a point about methodology.  The special concurrence is concerned about excessive reliance on the original meaning of constitutional provisions, especially when there is "modern technology."  According to the special concurrence: "[C]onsideration must be given to the evolving precedent interpreting open-ended constitutional provisions and to contemporary contexts and public attitudes."

But these justifications for the special concurrence seem inadequate.  Trash cans are not modern technology.  And what does it mean to say that precedents can evolve, that courts get to consider contemporary contexts, and that public attitudes can be taken into account?  Such statements may describe how judges act, but they aren't methodologies.

I prefer to rely on the sound precedent set forth in *Abel, Greenwood, Skola,* and *Henderson.*  Under a property rights approach as discussed in *Abel*, Wright had abandoned his trash and Officer Heinz committed no trespass by removing items from the open cans left out for collection.  Under a reasonable expectations approach as discussed in *Greenwood, Skola,* and *Henderson*, Wright had no reasonable expectation of privacy in trash cans put out for collection.

It is noteworthy that the special concurrence holds out Justice Frankfurter for particular praise in the area of search and seizure. *See Brown*, 930 N.W.2d at 879 (describing Justice Frankfurter as one of two "leading Court historians on search and seizure"); *Short*, 851 N.W.2d at 497, 503, 505–06 (commenting favorably on Justice Frankfurter's Fourth Amendment approach and quoting from him repeatedly).

I would follow Justice Frankfurter's example here. Notably, Justice Frankfurter wrote the decision in *Abel*. *See* 362 U.S. at 218, 80 S. Ct. at 686. In upholding the trash pull, Justice Frankfurter concluded, "There can be nothing unlawful in the Government's appropriation of such abandoned property." *Id.* at 241, 80 S. Ct. at 698.

For the reasons stated in this dissent and the separate dissents of my two colleagues, I would affirm Wright's convictions and sentence.

Christensen, C.J., and Waterman, J., join this dissent.